**KENAITZE INDIAN TRIBE,**
Plaintiff–Appellant,

v.

**STATE OF ALASKA,**
Defendant–Appellee.

No. 87–4110.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 1, 1988.

Decided Oct. 24, 1988.

As Amended on Denial of Rehearing and
Rehearing En Banc Jan. 4, 1989.

Carol H. Daniel and Donald S. Cooper, Alaska Legal Services Corp., Anchorage, Alaska, for plaintiff-appellant.

Sarah E. McCracken, Asst. Atty. Gen., Anchorage, Alaska, Larri I. Spengler, Asst. Atty. Gen., Juneau, Alaska, for defendant-appellee.

Elizabeth Ann Peterson, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for amicus.

Before KOZINSKI, NOONAN and THOMPSON, Circuit Judges.

KOZINSKI, Circuit Judge *:

We travel to the northern reaches of our circuit to resolve a dispute implicating two recurring Alaskan motifs: on the one hand, the clash between traditional and modern ways of life; on the other, fish. The Kenaitze Indian Tribe claims that the state of Alaska is attempting to evade federal legislation creating a priority for subsistence fishing by residents of rural areas. The controversy turns on the meaning of the word "rural" as used in the Alaska National Interest Lands Conservation Act (ANILCA), Pub.L. No. 96–487, 94 Stat. 2371 (1980) (codified as amended in scattered sections of Titles 16 and 43 of the United States Code).

### I

The Kenaitze, a tribe numbering approximately four hundred, have lived on the Kenai Peninsula, in southern Alaska, for hundreds of years. For most of their history, the Kenaitze have pursued a way of life dominated by subsistence fishing and hunting. In recent years, however, the area's proximity to Anchorage has made the Kenai Peninsula a center of commercial and sport fishing, and has transformed the Peninsula's economy to one based primarily on work for cash. Subsistence fishing has been crowded out by commercial harvesting and by sport fishing, the latter pursued with all the zeal of a Crusade. *See* Medred, *Combat Fishing*, Anchorage Daily News, May 15, 1988, at J–1 (describing "Alaska streams sometimes hidden behind a wall of humanity"); Freedman, *Fish Hard Die Free: Profiles in Carnage*, We Alaskans (Anchorage Daily News Magazine), Aug. 7, 1988, at N–7, N–8 ("It's said there are two kinds of people in Alaska: Those Who Fish, and Those Who Watch");

Jenkins, *So Many Fishermen, So Few Flies*, Anchorage Daily News, Aug. 10, 1988, at B–1.

In response to similar changes occurring throughout Alaska, Congress enacted ANILCA in 1980. The Act contains a number of provisions relating to conservation on federal lands, including the establishment of new units of the National Park, National Forest and National Recreation Area systems. Title VIII of ANILCA protects subsistence fishing by giving such fishing a priority over other types of fishing in federal waters in rural areas. 16 U.S.C. §§ 3111–3126 (1982 & Supp. IV 1986).

Congress prefaced Title VIII with a declaration that "the continuation of the opportunity for subsistence uses by rural residents of Alaska ... is essential to Native physical, economic, traditional, and cultural existence...." *Id.* § 3111(1). Congress further found that because "continuation of the opportunity for subsistence uses of resources on public and other lands in Alaska is threatened by the increasing population of Alaska [and] by increased accessibility of remote areas containing subsistence resources," *id.* § 3111(3), it was necessary for Congress "to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents." *Id.* § 3111(4).[1]

ANILCA accordingly provides that "the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes." *Id.* § 3114. Section 3113 defines "subsistence uses" as "the customary and traditional uses by *rural Alaska residents* of wild, renewable resources" for a variety of uses. *Id.* § 3113 (emphasis added).

The statute directs the Secretary of the Interior to establish the administrative

---

* Judge Thompson joins this opinion in its entirety. Judge Noonan joins parts I, II and IV.

1. Early drafts of Title VIII protected only subsistence uses by Native Alaskans. When the state advised Congress that the Alaska Constitution might bar the enforcement of a preference extended only to Natives, Congress broadened the preference to include all "rural residents." 126 Cong.Rec. 29,278–79 (1980) (statement of Rep. Udall). The state's subsequent narrowing of the definition of "rural residents" to exclude the native villages here, *see* pp. 314–15 *infra*, is thus more than a little ironic.

structure necessary for the implementation of the statute. *Id.* § 3115(a)–(c). The federal regulatory scheme is to be stayed, however, if the state of Alaska enacts laws "which are consistent with, and which provide for the definition, preference, and participation specified in, sections 3113, 3114, and 3115 of this title." *Id.* § 3115(d). The Secretary is to monitor the state's performance in this regard, and to report periodically to appropriate congressional committees. *Id.* § 3116. ANILCA authorizes any person or organization aggrieved by the failure of the state or federal government to enforce the subsistence priority set forth in section 3114 to file a civil action for injunctive relief in federal district court. *Id.* § 3117. Section 3117 provides the jurisdictional basis for this lawsuit.

Given the choice between federal regulation or self-regulation with federal oversight, Alaska chose the latter. The state enacted the necessary statutes in 1978, while Congress was still working on the final version of ANILCA. Pursuant to the state statutes, the state Joint Boards of Fish and Game promulgated regulations which, among other things, defined rural as describing any area other than a community with a population of 7,000 or more. Residents of these rural communities were to be afforded ANILCA's priority for subsistence fishing. In 1982, the Secretary of the Interior certified that the state legislative program was in compliance with ANILCA. Letter from Secretary James Watt to Governor Jay Hammond (May 14, 1982). This certification suspended federal regulation and left the state in charge of implementing ANILCA.

Soon after certification was completed, the Joint Boards of Fish and Game issued a new regulation, which materially altered the definition of rural and substantially narrowed the areas where subsistence fishing would be afforded a priority. According to the new definition, identification of a rural area depended on ten criteria, including the current pattern of subsistence uses by groups inhabiting the area. The principal effect of the new regulation was to deny the subsistence fishing priority to residents of areas dominated by a cash economy. In 1985 this regulation was invalidated by the Alaska Supreme Court as inconsistent with state law. *Madison v. Alaska Dep't of Fish & Game*, 696 P.2d 168 (Alaska 1985). The Alaska Legislature revived the regulation by amending the statute to conform to it. As amended, the statute defines "rural area" to mean "a community or area of the state in which the noncommercial, customary, and traditional use of fish or game for personal or family consumption is a principal characteristic of the economy of the community or area." Alaska Stat. § 16.05.940(25) (1987).

Invalidation of the earlier regulation in *Madison* had caused the Interior Department to advise the Governor of Alaska that the state had fallen out of compliance with ANILCA. After the new legislation, the Assistant Secretary of the Interior for Fish and Wildlife and Parks wrote a letter to the Governor of Alaska purporting to certify that the state was once again in compliance. Letter from Assistant Secretary William Horn to Governor Bill Sheffield (Nov. 7, 1986).

The Kenai Peninsula qualifies as a rural area under the state's original definition of the term, but not under the new definition. While vast areas of the Peninsula are covered by countryside and wilderness, its economy is no longer dominated by subsistence and barter.[2] This means that under the new state scheme, subsistence fishing in the Kenai is denied the priority provided by ANILCA. The Kenaitze, some of whom

---

**2.** Counsel for the state graphically described the situation at oral argument: "The Kenai Peninsula has Sears, Safeway stores and malls." True enough. Yet the Kenai has a long way to go before it approaches anything resembling an urban community. Its 25,000 inhabitants are spread over an area of 16,000 square miles, roughly the size of New Hampshire and Vermont combined. *The World Almanac* 573, 418 (1988). "The scenery is varied and beautiful. The massive peaks and broad ice fields of the Kenai Mountains form the spine of the peninsula, dropping away to the great forested plateau of the western area. Its many lakes, rivers and streams make the Kenai a prime sportfishing destination." *The Milepost* 336 (40th ed. 1988).

continue to engage in subsistence fishing, brought suit challenging this change in state law. The Tribe sought an order directing the state to promulgate regulations defining rural in a manner that would implement the federal subsistence priority. Along with the complaint, the Tribe filed a motion for summary judgment and asked the court for a preliminary injunction to prevent the state from enforcing its existing statutory and regulatory definition of rural. The district court denied both motions, and granted the state's crossmotion for partial summary judgment on the issue of whether Alaska was in compliance with ANILCA. The Tribe took an interlocutory appeal from the denial of the preliminary injunction. 28 U.S.C. § 1292(a)(1) (1982).

## II

We must first consider whether we interpret the statute de novo, or whether we owe deference to the interpretation already adopted by the Department of the Interior and the state of Alaska, as the entities charged with the statute's enforcement. The state, supported by the Secretary as amicus,[3] argues that we owe deference to the interpretation advanced by the Secretary. Specifically, the state points to the 1986 letter from the Assistant Secretary for Fish and Wildlife and Parks, which approves the state's revised definition of rural. Since the Secretary is charged with implementing ANILCA, the argument goes, we should defer to his determination that the state's definition of rural conforms with federal law.[4]

3. Plaintiffs sued only the state, not the Secretary of the Interior. As noted, this type of lawsuit is authorized by ANILCA, 16 U.S.C. § 3117, and is designed to bring state regulation into compliance with federal law.

4. The Secretary delegated the authority to make this determination to the Assistant Secretary for Fish and Wildlife and Parks. U.S. Dep't of the Interior, Departmental Manual 209 DM 6.1 (May 2, 1983) (No. 2489).

5. Although section 3117(a) requires the "exhaustion of any State or Federal (as appropriate) administrative remedies which may be available," it is clear in context that "Federal (as appropriate) administrative remedies" refers to remedies that would exist if the state had not supplanted ANILCA's regulatory scheme with its

■ Deference to an administrative agency's construction of a statute is appropriate, however, only where the agency is entrusted with the administration of the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982). We defer, therefore, only where the agency acts pursuant to a delegation of statutory authority. The 1986 letter was not such an action. The Secretary's responsibility in administering the Act includes an initial certification that the state has implemented a statute that complies with ANILCA and that federal regulation should accordingly be withheld. 16 U.S.C. § 3115(d). Once the state regulatory scheme is in place, the Secretary's powers are limited to monitoring the state's implementation of its legislative program and making periodic reports to Congress. *Id.* § 3116. ANILCA thereafter vests the power to approve or disapprove the state's performance in the courts alone. *Id.* § 3117(a).[5] The Assistant Secretary's 1986 letter purporting to recertify the state's compliance thus had no legally operative effect. Not being an exercise of the Secretary's statutory authority, it did not constitute the type of agency action to which a court owes deference.[6]

■ A more interesting question is posed by the suggestion that we defer to the *state*'s interpretation of ANILCA. The state's claim to deference is based on

own. Because the state has accepted section 3115(d)'s invitation to supersede federal regulation, there is no federal administrative remedy for a plaintiff to exhaust. The state, moreover, makes no claim that the Kenaitze have failed to exhaust any available state administrative remedies.

6. While we need not defer to the Secretary, his views are nevertheless valuable to the court in light of the Secretary's intimate familiarity with the statutory scheme and his supervisory responsibilities over the federal lands in question. We have given the Secretary's views, as expressed in the government's amicus brief, due consideration.

the fact that it performs functions not unlike those of a federal agency charged with implementing an Act of Congress. State law here operates like an agency regulation; state authorities, therefore, can claim to stand in the shoes of federal regulators.

While this argument is not without appeal, we reject it. Deference to a federal agency's interpretation of a statute is based in part on the expertise it possesses in implementing federal policy in the general subject area. *See Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist.*, 467 U.S. 380, 389–90, 104 S.Ct. 2472, 2479–80, 81 L.Ed.2d 301 (1984). While Alaska has a long history of managing large wilderness areas, it lacks the expertise in implementing federal laws and policies and the nationwide perspective characteristic of a federal agency. Federal agencies are also entitled to deference because their activities are subject to continuous congressional supervision by virtue of Congress's powers of advice and consent, appropriation, and oversight. Such direct and continuous congressional supervision is absent when state authorities are doing the regulating.

Most fundamentally, unlike a federal agency, the state is delegated no authority under ANILCA. The statute only provides that if the state wishes to regulate in a manner consistent with federal law, federal regulation will be withheld. ANILCA does not assign any particular functions to the state as, indeed, it could not. As a separate sovereign, the state is at all times free to refuse to regulate; Congress could not compel it to do so. If the state refuses, the Department of the Interior will step in and do the job. The state's role is thus more accurately characterized as supplanting the federal regulatory scheme, rather than implementing it. Deference is not appropriate.

We must therefore determine the statute's meaning on our own. It is to this task we now turn.

## III

■ This case boils down to what Congress meant when it legislated a priority for "customary and traditional uses by *rural* Alaska residents of wild, renewable resources." 16 U.S.C. § 3113 (emphasis added). The state has selected an unusual definition of the term rural, a definition that excludes most areas normally understood to be covered by the term. As Alaska defines the word, an area is rural only if its economy is dominated by subsistence fishing and hunting; it excludes areas characterized primarily by a cash economy, even though a substantial portion of the residents may engage in subsistence activities. The state's definition would exclude practically all areas of the United States that we think of as rural, including virtually the entirety of such farming and ranching states as Iowa and Wyoming.

The state argues that its definition of rural best promotes ANILCA's policy of protecting the subsistence way of life by excluding areas where that way of life has already been supplanted by a cash economy. The state's argument stands the process of statutory construction on its head. We look to policy in interpreting the statutory language; we do not rewrite the language to conform to the policy.[7] While statutory words sometimes have more than one meaning, and interpreting the statute may require judgment as to which of these meanings Congress contemplated, an interpreting body may not invent a completely new meaning for a statutory term. Any other rule of construction would rob statutes of binding force and allow free rein to those who implement federal statutes to do what they wish rather than what Congress directed.

The term rural is not difficult to understand; it is not a term of art. It is a standard word in the English language commonly understood to refer to areas of the country that are sparsely populated,

---

**7.** The state does not, of course, claim to be rewriting the statutory language. No one ever admits to taking a blue pencil to an Act of Congress. But precisely the same end is achieved through creative interpretation. Assigning exotic definitions to statutory terms alters the statute just as surely and effectively as changing the statutory language.

where the economy centers on agriculture or ranching. *See* Webster's Third New International Dictionary 1990ʹ (1981). More broadly, rural is the antonym of urban and includes all areas in between cities and towns of a particular size. *See id.*

The term has been used by the federal government in a variety of other contexts, all of them consistent with conventional understanding. The U.S. Census Bureau, for example, divides the population into two categories. The urban population consists of people living in communities of 2,500 or more, while the rural population comprises everyone else. U.S. Dep't of Commerce, Bureau of the Census, *1980 Census of Population,* vol. I, ch. B, part 3, at A–2. Many federal statutes use the word rural in its conventional sense. *See, e.g.,* 42 U.S.C. § 1395ww(d)(2)(D) (Supp. IV 1986) (for purposes of computing Social Security payments to hospitals for inpatient hospital services, "rural area" defined as any area outside a metropolitan area); 42 U.S.C. § 1490 (Supp. IV 1986) (for purposes of applying Title V of Housing Act of 1949, "rural area" defined as "any open country, or any place, town, village, or city which is not part of or associated with an urban area" and where the population does not exceed certain limits). The Federal Communications Commission and the Federal Housing Administration similarly define rural in terms of an area's population. *See National Cable Television Ass'n v. FCC,* 747 F.2d 1503, 1507 (D.C.Cir.1984); 7 C.F.R. § 1944.10 (1988). We are aware of no federal statute or regulation that uses the word rural in any sense other than the commonly accepted one.

The state contends, nevertheless, that its definition of the term is appropriate in the context of ANILCA because it best serves the congressional goal of protecting the traditional subsistence way of life in areas where that way of life is predominant. Even if we agreed that this approach more clearly accomplishes the purpose behind ANILCA—a proposition we would be reluctant to endorse—Congress passes laws, not purposes. What matters is not some general purpose that may have motivated the lawmakers but the means they chose to achieve that end. The fact that we can conceive of a better way of accomplishing what we think may have been the congressional purpose does not give us license to ignore the means Congress actually adopted.

Here Congress did not limit the benefits of the statute to residents of areas dominated by a subsistence economy. Instead, it wrote broadly, giving the statutory priority to all subsistence users residing in rural areas. To accept the state's contorted definition of rural would materially change the sweep of the statute, second-guessing the congressional policy judgment embodied in ANILCA. This we may not do.

The state's definition of rural would also lead to an inconsistency within the statute. ANILCA establishes not one but two levels of priority. The first, already discussed, gives subsistence users living in rural areas priority over other users. But the statute then goes on to consider the possibility of fish and wildlife shortages so severe that even subsistence uses must be curtailed. In such a situation, certain subsistence users enjoy a priority over others. Which subsistence users receive this benefit? Those who can establish "customary and direct dependence upon the [fish and wildlife] populations as the mainstay of livelihood." 16 U.S.C. § 3114(1). Under the state's approach, this provision would be robbed of all meaning. Because the state's narrow interpretation of section 3113 limits the benefits of ANILCA's general priority to residents of areas where subsistence fishing is the mainstay of livelihood, anyone who qualifies for those benefits would also qualify for the more restrictive priority of section 3114(1). We cannot adopt a statutory interpretation that renders one portion of the statute redundant when there is another interpretation that avoids such redundancy. Congress quite clearly intended that section 3113 encompass a larger class of beneficiaries than section 3114(1). Giving the term rural its conventional meaning accomplishes this while the state's interpretation does not. Even if the state's interpretation were otherwise permissible, we would have to reject

it in the name of internal statutory consistency.

The state nevertheless places heavy reliance on ANILCA's legislative history which, the state argues, overcomes all other considerations. But legislative history is not a panacea; it cannot overcome the structural and semantic problems discussed above. As the Supreme Court said with respect to this very statute, "[w]hen statutory language is plain, and nothing in the Act's structure or relationship to other statutes calls into question this plain meaning, that is ordinarily 'the end of the matter.'" *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 1408, 94 L.Ed.2d 542 (1987) (citation omitted). *See also Bethesda Hosp. Ass'n v. Bowen*, — U.S. —, 108 S.Ct. 1255, 1258, 99 L.Ed.2d 460 (1988); *United States v. Taylor*, — U.S. —, 108 S.Ct. 2413, 2423, 101 L.Ed.2d 297 (1988) (Scalia, J., concurring in part) (where meaning of statute is clear, "there is no justification for resort to the legislative history"). Congress has used a simple term, one that is not reasonably susceptible to the interpretation the state advances. The legislative history, even if it were relevant, could not infuse a statutory term with a meaning to which it is not susceptible.

We conclude therefore that the state's redefinition of rural does not comport with section 3113. Alaska has failed to enforce the statute's subsistence priority; the state is not in compliance with ANILCA.

## IV

We end as we began. This is a case involving a clash of lifestyles and a dispute over who gets to fish. Congress, using clear language, has resolved this dispute in favor of the Kenaitze who choose to pursue the traditional subsistence way of life by giving them priority in federal waters. The state has attempted to take away what Congress has given, adopting a creative redefinition of the word rural, a redefinition whose transparent purpose is to protect commercial and sport fishing interests.

The state is not required to regulate pursuant to ANILCA. If it does so, however, it is bound to implement the statute as Congress passed it, not as some of its citizens would prefer that it had been passed. If Alaska believes that the subsistence priority is too generous, or interferes too severely with commercial and recreational fishing, its elected federal representatives can attempt to amend the statute. The state may not achieve the same objective through indirection.[8]

We reverse the judgment of the district court and remand for entry of a preliminary injunction.[9]

NOONAN, Circuit Judge, with whom THOMPSON, Circuit Judge, joins, concurring:

The Kenaitze live principally along the eastern shore of Cook Inlet from Anchor Point to Point Possession, though some possibly inhabit the western shore, principally at Kuskatan. Clare Swan, *Subsistence Research Project Kenaitze Indian Tribe* 3 n. 1 (1981). The Tribe consists of approximately 400 descendants of Tanaina Athabaskan Indians who replaced Eskimos on the Kenai Peninsula sometime between 500 and 1500 A.D. Carolyn E. Reed, *The Role of Wild Resource Use of Communities of the Central Kenai Peninsula and Kachemak Bay, Alaska* 13 (1985). The rhythm of life of the Tribe in the days in which its traditions were established appears to be captured in these words:

### DENAI'NA SEASONAL CYCLE

| | |
|---|---|
| tuneyashi | the snow begins to melt |
| tlkhu-khakeneu | people catch king salmon |
| talkheneu | the geese come flying |
| koonaneo | people catch pink salmon |
| banan-kantlkhtsi | the berries ripen |
| banan-ttstanashi | people come away from the hills |
| banan-ktichiki | the foilage is red |
| bkanchenshane | the earth grows cold |
| golchana-naga | people go to visit one another |

---

8. The state argues that article IV, section 4 of the Constitution, which "guarantee[s] to every State in this Union a Republican Form of Government," and the tenth amendment, which reserves to the states powers not delegated to the federal government, preclude a federal court from directing the state to amend its laws to make them consistent with ANILCA. Whether or not this proposition is correct, it has no relevance here. We do not purport to be directing the state to amend its laws; it is free to eschew any further entanglement with the federal government by advising the Department of the Interior that it is withdrawing from its role in administering ANILCA.

9. ANILCA provides that "[l]ocal residents and other persons and organizations who are prevailing parties in an action filed pursuant to this section shall be awarded their costs and attorney's fees." 16 U.S.C. § 3117(a). In the interest of convenience and economy, we instruct the district court on remand to award the Kenaitze an amount equal to their attorneys' fees for bringing this action, including this appeal.

| | |
|---|---|
| takoshi | the geese fly south, the bear hides himself |
| banan-tlkhtsi | it begins to snow |
| banan-tuksti-tlkhe | the days begin to lengthen |

Robert E. Ackerman, *The Kenaitze People* 53–54 (1972), cited in Swan, *supra,* after p. 4.

Russians arrived and Russian settlements were established near the end of the eighteenth century, introducing a trade in furs. American traders replaced the Russians after 1867. Commercial salmon fishing by Americans began in 1880 with a cannery being built at Kasilof. Reed, *supra,* at 14–15 (1985).

The traditional life appears to have been relatively unchanged when it was surveyed in 1931–1934 by an anthropologist, Cornelius Osgood. He wrote:

Five kinds of salmon appear in the Tanaina area—humpbacks, dogs, silvers, reds, and kings. The humpbacks swim every place in the bays and creeks during their season around Seldovia. At Kenai they make their main run during July when they go far up the rivers. Humpback salmon appear in the Upper Inlet but they are said to be only occasional visitors around Tyonek and there are none at Iliamna. The same information is true for dog salmon, except that they apparently do not go so far up the rivers, a few appearing around Tyonek in late July. The silver salmon run late in the season. They occur in all areas except Iliamna and are noted for the fact that they travel a long way up the rivers. The most important of all, especially since they come at a time when food is scarce, are the red and king salmon, which the Tanaina look for in May. The king salmon do not appear in Kachemak Bay and at Iliamna, however. At Iliamna, red salmon supply the principal summer food.

The ordinary native method of catching salmon is to construct a weir by damming a creek or small river with a construction of logs and debris set diagonally upstream from each side toward a small opening in the center through which the fish are forced to pass, thus entering a V-shaped trap of logs about ten feet on a side, from which they can-not extricate themselves. One man stands in the trap and with a small dipnet takes out two or three fish at a time, which another man kills with a club. A third man puts a spruce root line through their gills (or throws them into a boat) and brings them ashore. Sometimes, instead of the simple fish weir, the Indians make a basket trap of long alders with a conical entrance which they place at the opening of the dam. They remove the fish from a door in the same manner as described above. The Kachemak Bay Tanaina do not use a gaff-hook in fishing, but at Kenai the latter instrument serves for catching crabs.

The Tanaina also catch fish by the use of a dragnet made of alder poles tied together with spruce root line. Men take hold of each end, and with another man in the middle, they push the fish into shallow water, where they kill them with wooden clubs. Sometimes the fish are pushed on to flats where they strand at low tide. When all the fish have been taken ashore, an old man counts and divides them equally. The women clean the fish, the boys wash them, and old men hang them up to dry.

Cornelius Osgood, *The Ethnography of the Tanaina* 28–29 (1937), *reprinted in* 16 *Yale Univ. Publications in Anthropology* (1966).

After World War II, homesteading increased on the Kenai Peninsula. The development of oil fields led to substantial growth after 1957. Reed, *supra,* at 17. In 1951 a highway was completed linking the Kenai Peninsula to Anchorage and leading to a substantial increase in tourism. In economic terms commercial fishing ranks first; oil production, second; tourism, third. *Id.* at 18.

By 1976 it was observed that in rural Alaska a shift had occurred from an economy of subsistence fishing and hunting, rounded out by work for cash, to a cash economy, rounded out by subsistence activities. The shift varied greatly from village to village. Indeed the mix of cash and subsistence uses varied according to four factors: the season; the number of the

persons working in the family; the availability of cash-paying jobs; and the availability of subsistence resources. Nancy Yaw Davis, *Steps Toward Understanding Rapid Culture Change in Native Rural Alaska*. Federal–State Land Use Planning Commission for Alaska: *Commission Study No. 16* 23 (1976).

There are now 30 different occupations which have been identified as providing cash income to Natives. Swan, *supra*, 7. About 9 percent of persons on the Tribe's voting roll hold commercial fishing permits. *Id.* at 6.

The number of salmon caught for subsistence has been very small in relation to commercial harvesting. For example in 1980 in which a very high number of subsistence permits (1,219) were issued, the total salmon caught by subsistence users was 14,279. The salmon commercially harvested were 4,128,130. Swan, *supra*, Table I after p. 6. From 1971 to 1980, commercial, sport and subsistence user groups on the Cook Inlet caught 4 million salmon in even years, and in the odd years, 3.8 million. *Id.* at II–1. Commercial fishermen caught 95 percent of the salmon and sports fishermen were the second largest harvesters of salmon. *Id.* at II–2. One study of the Upper Cook Inlet found that the percentage of the salmon harvest attributable to subsistence fishermen constituted .008 percent in 1977, .07 percent in 1978, .47 percent in 1979, and .33 percent in 1980. Stephen Braund, *Cook Inlet Subsistence Salmon Fishery* 33 (1982).

As this review indicates, I have taken a look—the kind of preliminary look necessary to consider a preliminary injunction—at facts that appear not to be in dispute. Three things stand out: First, there was a long tradition of the subsistence uses of salmon by the Tribe. Second, there has been considerable economic and social change on the Kenai Peninsula. Third, the subsistence uses are very small compared with the salmon taken by commercial and sports fishermen. These patterns point in different directions as to what good regulation of subsistence uses on the Kenai Peninsula would require. As a court of appeals we are certainly not in a position to decide.

What we are in a position to decide is what the Conservation Act requires. The Conservation Act could be interpreted as freeing Alaska to do what it likes if the laws it first enacted met the requirements of 16 U.S.C. § 3115(d). But the statute itself provides that if the Alaska laws "are repealed" they no longer supersede the federal law governing state responsibility. *Id.* The change in Alaska Legislation in May 1986 may fairly be interpreted as a repeal of the laws that had been found by the Secretary to be in compliance with the Conservation Act.

If the statute was read in the most literal way possible, Alaska would have lost its only chance to take responsibility—it would have repealed the laws that were satisfactory. It would have no opportunity to re-enact others. But we think such a wooden reading of the Conservation Act would be contrary to the basic thrust of the legislation. If Alaska is not in conformity with the Conservation Act, it may again get itself within the federal requirements.

Alaska supposes that it can get into conformity by a certification by the Secretary. The Secretary takes the same position, in an amicus brief arguing that the court should defer to his certification. But there is simply no provision in the statute for the Secretary assuming this role. The Secretary had one directive to carry out under section 3115(d), and he did so. After that his role is to monitor the provisions of the state and report to Congress. 16 U.S.C. § 3116.

We are directed by Section 3117 to enforce a federal statute. There is no basis for us to defer either to the Secretary or the state. Congress provided in explicit terms what is to be given priority. It is "non-wasteful subsistence uses," 16 U.S.C. § 3114, which are "the customary and traditional uses" of "rural Alaska residents." 16 U.S.C. § 3113. The uses of *residents* are not the uses of rural areas or communities or groups. At the time the statute was enacted it was clear that traditional subsistence uses varied from village to village,

season to season, family to family. Davis, *supra* at 23. The statute is directed to the protection of individuals who individually followed the traditional ways.

The state may not subtract from this federal statute. It has done so and so must be enjoined. The Tribe is entitled to an injunction providing that subsistence uses of fish by members of the Tribe shall be given a priority by the state over all other uses so far as necessary as to preserve the subsistence uses of such users. 16 U.S.C. § 3114.

I also concur in parts 1, 2, and 4 of the opinion of the court.