**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**George J. ALEXANDER,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Henry W. PEELE, Defendant–Appellant.**

**Nos. 89–30253, 89–30259.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 2, 1990.

Decided July 5, 1991.

Shawn J. Holliday, Groh, Eggers & Price, Anchorage, Alaska, for defendant-appellant Peele.

Sidney K. Billingslea, Asst. Fed. Public Defender, Anchorage, Alaska, for defendant-appellant Alexander.

Joseph W. Bottini, Asst. U.S. Atty., Anchorage, Alaska, for plaintiff-appellee.

Before KOZINSKI, O'SCANNLAIN and FERNANDEZ, Circuit Judges.

KOZINSKI, Circuit Judge.

Defendants Alexander and Peele were convicted of trafficking in herring roe on kelp—fish eggs on seaweed.[1] This, it turns out, is an exotic delicacy that fetches as much as $60 per pound in Japan. In fact, global demand for this gustatory delight has endangered Alaska's fisheries, inducing the state to prohibit all harvesting except for subsistence uses. Unhappily for the government, this fish tale, like so many others, is about the ones that got away.

### Facts

The facts that spawned this controversy are relatively straightforward. Defendants Alexander and Peele are Haida Indians. Peele harvested over half a ton of herring roe on kelp in Southeastern Alaska and enlisted Alexander's help in selling it. However, they had permits for only 444 pounds. Undeterred, they loaded an old Dodge station wagon to the gills with the contraband and trawled Canada for a buyer. Their plan began to flounder when they were unable to hook a buyer and the herring roe began to rot. They then attempted to enter the United States, hoping to unload their now malodorous cargo in the state of Washington. Alerted by Cana-

---

**1.** Some herring lay "sticky eggs with an adhesive secretion" that stick to the kelp shortly after they're released. 19 Encyclopaedia Britannica 227 (15th ed. 1986).

dian officials, United States Customs agents snared the purloiners of prenatal pisces.[2] Defendants were charged with violating the Lacey Act, which makes it illegal to transport in interstate or foreign commerce any fish or wildlife taken or sold in violation of state law. 16 U.S.C. § 3372(a)(2)(A). The jury convicted and defendants appeal.

## Discussion

Once again we confront "a dispute implicating two recurring Alaskan motifs: on the one hand, the clash between traditional and modern ways of life; on the other, fish." *Kenaitze Indian Tribe v. Alaska,* 860 F.2d 312, 313 (9th Cir.1988), *cert. denied,* 491 U.S. 905, 109 S.Ct. 3187, 105 L.Ed.2d 695 (1989). The juxtaposition of these two motifs is no accident. Many Alaska natives who are not fully part of the modern economy rely on fishing for subsistence. If their right to fish is destroyed, so too is their traditional way of life.

To prevent the destruction of "Native physical, economic, traditional, and cultural existence," 16 U.S.C. § 3111(1), Congress passed the Alaska National Interest Lands Conservation Act, (ANILCA), Pub.L. No. 96–487, 94 Stat. 2371 (1980) (codified as amended in scattered sections of Titles 16 and 43 of the United States Code). ANILCA protects "subsistence uses [of fish and wildlife] on the public lands by Native and non-Native rural residents," 16 U.S.C. § 3111(4), by requiring that nonwasteful subsistence uses of fish and wildlife be given priority over all other uses: Subsistence uses may not be restricted unless necessary to protect the continued viability of fish and wildlife populations. *Id.* § 3114.

ANILCA, however, is a law without a bite. It does not of its own force regulate subsistence and nonsubsistence uses; it criminalizes no conduct; it prescribes no penalties. In fact, ANILCA does little more than provide a broad outline of what uses must be preferred over others; it leaves implementation to the Secretary of the Interior. *See id.* § 3115(a)–(d).

ANILCA also contains an opt-in clause for the state of Alaska: If Alaska enacts laws consistent with the federal statute, the federal scheme is stayed and Alaska law controls instead. *Id.* § 3115(d). "Given the choice between federal regulation or self-regulation with federal oversight, Alaska chose the latter." *Kenaitze Indian Tribe,* 860 F.2d at 314. It hatched a complex set of state hunting and fishing regulations, all of which, to be consistent with ANILCA, must give priority to subsistence uses. While defendants were not prosecuted under state law, these state regulations lie at the heart of this dispute nonetheless: To sustain a conviction under the Lacey Act, the government must prove that the herring roe was taken in violation of state law. *See* 16 U.S.C. § 3372(a)(2)(A).[3]

## I

At trial, the prosecution contended the herring roe was taken in violation of two different state regulations; defendants argue that both regulations are invalid because they interfere with "customary trade," one of the subsistence uses protected by ANILCA. The controversy centers on the meaning of customary trade and, specifically, whether it includes sales made for cash.

■ A. The first regulation the government relies on is 5 Alaska Admin.Code § 01.010, which prohibits the *sale* of herring roe caught for subsistence. The question is whether this blanket prohibition is consistent with the priority ANILCA accords to subsistence uses.[4] The govern-

---

**2.** The government confiscated the herring roe and sold it at auction. Because of its inferior quality and condition, it only netted $7.50 per pound.

**3.** Defendants clearly transported the herring roe in both interstate and foreign commerce: They

drove a station wagon full of it from Alaska, through Canada, and into the state of Washington.

**4.** The regulation first holds out hope that there might be an exception to this prohibition by stating that sales are prohibited "unless other-

ment insists it is. According to the government, selling fish eggs for cash is, by definition, not a subsistence use. Defendants argue that the regulation prevents Alaska Natives from engaging in a subsistence use called "customary trade." Customary trade, they contend, includes sales for cash. The dispute turns on the answer to two questions: First, is customary trade a subsistence use protected by ANILCA? Second, does customary trade include sales for cash?

The first question has an easy answer: Customary trade is, in fact, a subsistence use. ANILCA defines subsistence uses as:

the customary and traditional uses by rural Alaska residents of wild, renewable resources ... for barter, or sharing for personal or family consumption; *and for customary trade.*

16 U.S.C. § 3113 (emphasis added). Neither party quarrels with this conclusion.

The second question—whether customary trade includes sales for cash—is harder: ANILCA does not define customary trade. Nonetheless, trade is commonly defined as "[t]he act ... of buying and selling for money; traffic; barter." Black's Law Dictionary 1492 (6th ed. 1990). It appears, therefore, that customary trade *could* in-

clude sales for cash, as well as barter transactions.

■ Examining the statute further leads to the conclusion that such an interpretation is not merely permissible but necessary. "Barter" is separately listed as a subsistence use, 16 U.S.C. § 3113; if the phrase "customary trade" is to add anything at all to the statute, it must include buying and selling for money.[5] The Alaska Joint Boards of Fisheries and Game seem to agree: Their criteria for identifying subsistence uses provides that "customary trade may include limited exchanges for cash." 5 Alaska Admin.Code § 99.010(b)(7).[6] We therefore conclude that the term customary trade includes some sales for cash. To the extent Alaska law prohibits cash sales that are part of customary trade, it conflicts with ANILCA.[7]

■ B. The government also contends that the herring roe was taken in violation of state law because defendants exceeded the catch limits of 5 Alaska Admin.Code §§ 01.730(a), (g). Defendants challenge those limits. They point out that Alaska failed to make an exception for customary trade when it banned *sales* of subsistence caught fish eggs, *see id.* § 01.010(d); they ask us to infer that Alaska similarly ne-

wise specified in this chapter." 5 Alaska Admin. Code § 01.010(d). The remainder of chapter 1, however, provides no exceptions.

5. Another panel of this court appears to have reached the same conclusion. *See United States v. Skinna*, 931 F.2d 530, 532 (9th Cir.1991) (Customary trade presumably "differs from barter, which is defined as a noncommercial exchange for items other than money.").

6. Because we are interpreting the meaning of a phrase that appears in a federal statute, we owe the state regulatory agency's interpretation no deference. *Kenaitze Indian Tribe*, 860 F.2d at 315–316. However, we find it instructive that the regulations of the Joint Boards of Fisheries and Game contradict the government's argument that customary trade excludes sales for cash.

7. The dissent argues that Alaska was entitled to eliminate subsistence uses altogether and, therefore, it was entitled to take the lesser step of eliminating *some* subsistence uses, here customary trade. *See* dissent at 950. While this great-

er-includes-the-lesser argument comports with common sense, it is not supported by ANILCA. The federal statute deals expressly with the situation where the state must limit or eliminate subsistence uses; it provides that any such restrictions "shall be implemented through appropriate limitations based on the application of the following criteria: (1) customary and direct dependence upon the populations as the mainstay of livelihood; (2) local residency; and (3) the availability of alternative resources." 16 U.S.C. § 3114. The elimination of one particular type of subsistence use—customary trade—does not comport with these statutory criteria; the government has never argued that it does.

We share the dissent's concern about the depletion of natural resources. *See* dissent at 950. However, a salutary end may not be accomplished by unlawful means. The protection of individual liberty, as embodied in the requirement that no person be subjected to criminal sanctions except pursuant to lawful authority, is also an important value in a free society. When the twain conflict, the former must yield to the latter.

glected to allow for sales made in customary trade when it established the harvest limits. We decline to give serious consideration to a challenge based on such speculation. Defendants have presented no evidence of what was or was not considered by the Board of Fisheries in adopting 5 Alaska Admin.Code §§ 01.730(a), (g); nor have they provided us access to the administrative record of the promulgation proceedings. Because we are unable to make an informed judgment on defendant's challenge to the harvest limits, we reject it without prejudice to its renewal on the basis of a more complete record on remand.

## II

Having concluded that Alaska's prohibition on cash sales conflicts with ANILCA, we consider the consequences.

■ A. The government has an easy answer: There are none. According to the government, the conflict between state law and ANILCA doesn't help the defendants because they failed to petition the Board of Fisheries to change its regulations before they went fishing. The image of these two defendants driving their beat-up Dodge station wagon to the Board of Fisheries to argue that a small section of the regulations is inconsistent with an obscure phrase in a massive federal statute is a bit incongruous; they are fishermen, not legal scholars. Their only meaningful opportunity to challenge the regulations was at their trial. We will not find their challenge precluded "unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Labs. v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18

L.Ed.2d 681 (1967).[8] The government has offered no such reason.

■ The only conceivable basis for refusing to consider defendants' argument is ANILCA section 807, 16 U.S.C. § 3117. Section 807 creates a civil cause of action for persons aggrieved by the State's failure to provide for subsistence uses. Subsection (c) provides that section 807 is "the sole Federal judicial remedy created by this subchapter." ANILCA § 807(c), 16 U.S.C. § 3117(c).

It is unclear whether this language precludes the defense of statutory invalidity in a criminal proceeding. Defendants haven't requested anything one would normally think of as a "judicial remedy"; they do not seek an injunction, damages or the suppression of evidence. Instead, they ask us to hold, in the course of adjudicating their criminal case, that ANILCA supersedes an inconsistent state regulation. While there is reasonable room for disagreement, the traditional view is that the application of a superior law over an inferior one in a case already before the court is not a judicial remedy. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177–78, 2 L.Ed. 60 (1803) (characterizing judicial review not as remedy but as application of particular principle of construction—that superior laws must be applied over inferior ones when they conflict); *see also Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210–11, 6 L.Ed. 23 (1824) (applying federal law over state law).[9]

Furthermore, section 807 is part of a purely civil statute. *See* p. 945 *supra* (ANILCA neither regulates subsistence uses nor criminalizes any conduct). It's highly unlikely it was written with an eye to limit-

---

**8.** There is good reason for this: Although the Supreme Court has held that Congress may prohibit such challenges during time of war, *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), there is some doubt whether Congress may constitutionally do so during peacetime. *See id.* at 459–60, 64 S.Ct. at 684 (Roberts, J., dissenting); *id.* at 461–63, 64 S.Ct. at 684–86 (Rutledge, J., dissenting); *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 289–91, 98 S.Ct. 566, 575–76, 54 L.Ed.2d 538 (1978) (Powell, J., concurring).

**9.** Where Congress has meant to preclude us from passing on the validity of a statute, it has said so explicitly. *See, e.g., Adamo Wrecking Co. v. United States*, 434 U.S. 275, 277, 98 S.Ct. 566, 568, 54 L.Ed.2d 538 (1978) (statute that precluded *"judicial review* [of the regulations] in civil *or criminal proceedings"* (emphasis added)); *Yakus v. United States*, 321 U.S. 414, 429, 64 S.Ct. 660, 669, 88 L.Ed. 834 (1944) (statute stripping federal courts of "jurisdiction or power to consider the validity" of the regulations and vesting an emergency court with "exclusive jurisdiction").

ing the rights of criminal defendants. Indeed, section 807 is exclusively concerned with relief available to civil litigants: It provides for preliminary injunctions, permanent relief—including orders directing the state of Alaska to promulgate new regulations—and attorney's fees and costs. *See* ANILCA § 807(a), 16 U.S.C. § 3117(a). Thus, the most plausible interpretation of section 807(c) is that it prohibits courts in civil proceedings from awarding relief not listed in the statute, such as damages, but does not address whether we may apply normal preemption principles in the course of adjudicating a federal criminal prosecution.

Finally, section 807(c) only speaks of creating the sole *federal* judicial remedy; it says nothing about preemption in state court. It would be anomalous to conclude that Congress has prohibited federal courts from holding state law preempted when it conflicts with federal law, but has left untouched the constitutional requirement that state courts do so. *Bobby v. Alaska*, 718 F.Supp. 764, 787 (D.Alaska 1989). We conclude therefore that section 807 does not prevent us from considering the validity of state regulations in the course of adjudicating a criminal prosecution.[10]

■ B. While we would normally strike down a state regulation that is inconsistent with federal law, that's neither necessary nor desirable here. The prohibition on cash sales is an integral part of the framework protecting Alaska's fisheries from the predations of those who are not entitled to subsistence uses. In most cases, it works just fine; the conflict with ANILCA is only problematic in the rare situations where the regulation is enforced against an Alaska native who is arguably engaged in customary trade.

There's no reason to throw a monkeywrench into the state regulatory machinery when a little fine tuning will do. To protect Alaskans who are entitled to sell fish and fish eggs in customary trade, we need only permit them to defend against a criminal prosecution on the ground that their activity is protected by ANILCA. *Cf., e.g., United States v. United States District Court (Kantor)*, 858 F.2d 534, 542 (9th Cir.1988) (allowing defense not contemplated by statute to save it from invalidation). Thus, defendants must be given an opportunity to prove by a preponderance of the evidence that they were in fact engaged in customary trade. *See Skinna*, 931 F.2d at 533 (defendant bears burden of demonstrating the extent of customary trade and that his own conduct was consistent with it). Such a defense may be presented by appropriate motion to the court or, if there are controverted issues of fact, presented to the jury with proper instructions. *Estep v. United States*, 327 U.S. 114, 144–45, 66 S.Ct. 423, 437–38, 90 L.Ed. 567 (1946) (Frankfurter, J., concurring).

■ Of course, this defense is not available to all Alaskans. The defendant must be a rural Alaska native for whom such trade is "customary and traditional." 16 U.S.C. § 3113. Furthermore, the trade must be conducted in a manner consistent with a subsistence lifestyle; ANILCA does not permit the establishment of significant commercial enterprises under the guise of subsistence uses. 5 Alaska Admin.Code § 99.010(b)(7); *see* S.Rep. No. 413, 96th Cong., 2d Sess. 234, *reprinted in* 1980 U.S. Code Cong. & Admin.News 5070, 5178. Thus, the size of the transaction or the manner in which it is conducted may place it outside the bounds of customary trade. *See, e.g., Skinna*, 931 F.2d at 533 (sale of 32,000 pounds of herring roe for $91,000 outside regulatory criteria for subsistence use).

■ C. Defendants here made a showing that their activities fell within the scope of customary trade as practiced by their ancestors. At trial, 85–year–old Haida eld-

---

**10.** A contrary interpretation of section 807 also makes no sense. If defendants were precluded from raising their argument here, they could still pursue the civil action provided by section 807. Armed with a favorable judgment, they could then collaterally attack their convictions as inconsistent with federal law. The net result would be the same but the delay and number of proceedings would triple.

er Victor Haldane testified that, as far back as he could remember, the Haidas traded and sold herring roe on kelp whenever they could. RT 173–76; *see also* Peele ER 18, RT 206, 218. He explained that the Haida Indians have customarily traded herring roe with other tribes, RT 174, and with foreigners, RT 177. The Haidas have ventured as far south as California to trade their herring roe. Peele ER 15; *see also id.* at 19 (trade with Seattle). This trade included cash transactions as early as 1913 or 1914. Peele ER 16; *see* RT 177 (trade with the Japanese from 1930). The government offered nothing to controvert this evidence.

■ But defendants' evidence was not considered: In accordance with Alaska law, the jury was instructed that it's always unlawful to sell subsistence taken fish eggs. Jury Instruction No. 27, CR 85. The district judge refused to give a customary trade instruction. In closing argument, the Assistant U.S. Attorney harped on the absence of such an instruction:

> Ladies and gentlemen, under the laws of the State of Alaska you simply can't take herring spawn on kelp ... and sell it. You just can't. If you find anything in these instructions that suggests that you can take herring spawn on kelp as a Haida native and sell it and somehow you're exempt from that restriction, then you ought to cut them loose. But there is nothing here in the law ... that says that.

RT 221.[11] Federal law, however, does allow rural Alaskans to sell herring spawn on kelp so long as the sales are made as part of customary trade. *See* pp. 945–

46 *supra.* Because the jury was not permitted to decide whether defendants were engaged in customary trade, their convictions must be vacated.[12]

### Conclusion

We vacate the judgments of conviction and remand for a new trial. Defendants may be tried on the theory that they exceeded the limits set out in their permits exactly as before. However, if the government relies on the fact that defendants intended to sell the herring roe in violation of 5 Alaska Admin.Code § 01.010(d), the district court must instruct the jury that limited cash sales in the course of customary trade are permissible.

FERNANDEZ, Circuit Judge, dissenting:

Let it first be said that we are not dealing with a person who simply sought to subsist on a fishery closed to all but subsistence users. We deal with individuals who sought to make a great deal of money by taking an enormous quantity of herring spawn on kelp, and who only failed in their goal because they were as inept as they were greedy. The question is whether they can do such a thing and avoid a conviction for transporting their booty in interstate commerce. *See* 16 U.S.C. §§ 3372–73. I think not.

Defendants claim that they were improperly convicted because Alaska's limits on the amount of spawn on kelp they can take are invalid and because the Alaska limitations on sales are also invalid. I believe they are incorrect on both scores.

---

**11.** The government similarly argued that defendants' attempted sale was impermissible because it was not made to family members. "[C]ustomary trade," the Assistant U.S. Attorney explained, "is still restricted to personal or family consumption." RT 200–01. The federal statute, however, does not limit customary trade to personal or family use. *See* 16 U.S.C. § 3113. Indeed, Congress specifically chose *not* to include such a requirement. S.Rep. No. 413, 96th Cong., 2d Sess. 234, *reprinted in* 1980 U.S.Code Cong. & Admin.News 5070, 5178 ("The definition has been modified to eliminate the 'for personal or family consumption' limitation

upon the taking of ... resources for 'customary trade.'").

**12.** Although we have rejected defendants' challenge to Alaska's harvest limits for herring roe on kelp, 5 Alaska Admin.Code § 01.730(g), we must nonetheless vacate their convictions. While the jury might have convicted because it concluded that defendants violated that regulation, *see* Jury Instruction No. 24, CR 85, it might have instead convicted on the basis of Alaska's ban on cash sales, 5 Alaska Admin.Code § 01.010(d). *See* Jury Instruction No. 27, CR 85 (explaining that it is illegal to sell subsistence caught fish or fish eggs).

The suggestion that it is somehow improper for Alaska to adopt limits on the amount that can be taken, because those limits may not encompass the vast amount that the defendants would like to sell under the "customary trade" guise, is hardly worthy of consideration. ANILCA assumes that any regulatory scheme will, indeed, be designed to protect fisheries, and may even restrict all subsistence use taking, if that is deemed necessary. 16 U.S.C. §§ 3112 and 3114. Thus, I fail to see how these defendants can parry the attack upon their actions by baldly asserting that the taking limits of 5 Alaska Admin.Code §§ 01.730(a) and (g) are somehow improper. More must be shown and was not.[1] This, however, inevitably leads to their second and somewhat more serious point.

The Alaska regulations prohibit all sales of "subsistence-taken fish, their parts, or their eggs...." 5 Alaska Admin.Code § 01.010(d). I will assume for present purposes that spawn on kelp can be called subsistence-taken fish, which I do because the contrary was not argued in the trial court.[2] I also assume, as does the majority, that through its administrative processes Alaska has, indeed, prohibited all cash sales of spawn on kelp, even by individuals whose ancestors did customarily trade in that commodity in days of yore. If so, is it always illegal to apply the regulations to sales which constitute customary trade?

It is true that ANILCA provides for customary trade, but as I have noted, it also provides for limitations on subsistence uses, which, of course, include that trade. 16 U.S.C. §§ 3112–14. For their part, the Alaska statutes also make provisions for customary trade, Alaska Stat. § 16.05.940(31), and confer upon the Board of Fisheries (Board) the duty of deciding what may be taken for that use. Alaska Stat. § 16.05.258. The Board has done so and does not, in general, prohibit customary trading, even for cash. 5 Alaska Admin.Code § 99.010. However, when it came to subsistence-taken fish and fish eggs, all sales were precluded and no exceptions were made for customary trade. 5 Alaska Admin. Code § 01.010(d). That being true, if the regulation is valid, the activities of these defendants were illegal.

But on what basis can it be said that the regulation is not valid? Surely, if the Board can prohibit all subsistence uses in order to protect the fishery, it can prohibit a part of those uses for the same purpose. Defendants' suggestion that it is an all or nothing proposition—all subsistence uses or none at all—makes about as much sense as their claim that the Board cannot place any limits on the amount taken, so long as the amounts were once taken for any subsistence uses. For example, it seems obvious that the taking of vast amounts in order to sell them for cash on the international market may well put pressures on the fishery that would not occur otherwise. Excessive takings could, indeed, destroy a fishery. The Board was entitled to consider that. History demonstrates that peoples have often destroyed their environments, and the creatures within those environments, by overusing them. Many a civilization collapsed and many a creature became extinct from those causes long before the advent of mechanized modern man. We may, and rightly do, flog ourselves for our own excesses, but as Rene Dubos so pithily put it: "All over the globe and at all times in the past, men have pillaged nature and disturbed the ecological equilibrium, usually out of ignorance, but also because they have always been more concerned with immediate advantages than with long range goals." R. Dubos, A God Within 161

---

1. I agree with the majority that defendants' attack on this regulation is wholly speculative.

2. The argument could be made that the phrase "or their eggs" only applies to subsistence taken fish. The eggs involved in spawn on kelp are not from subsistence taken fish, unless fish eggs *are* fish. On the other hand, the regulations do require a "fishing permit" *to* take spawn on kelp. 5 Alaska Admin. Code § 01.730(a), so it is not entirely unintelligible to treat spawn on kelp as fish. If the issue were raised, application of the rule of lenity to this seeming ambiguity would have to be considered. *Bell v. United States,* 349 U.S. 81, 83–84, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955); *McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931).

(1972). This case shows that at least these individuals are not exempt from the reach of that observation.[3]

Perhaps one can attack the regulations in this criminal proceeding by showing that they improperly fixed the amount or improperly restricted usage of that amount, at least in this instance. But far more is needed than an incantation of the phrase "customary trade." Nor can it be enough to show that one's peoples once customarily traded. Clearly ANILCA does not say that is all there is to it. It seems to me that one must show that Alaska has abused its power to protect the fisheries by limiting their use in this way. Defendants made no attempt to do so. They did not pursue administrative remedies in order to have the fishery opened up further. *See* 16 U.S.C. § 3117; 5 Alaska Admin.Code §§ 99.010–030; 5 Alaska Admin.Code §§ 96.010–96.920. They simply went ahead and conducted their depradations.

Beyond that, in this case they contented themselves with presenting evidence that there had been customary trade, but did not present evidence to demonstrate that the Alaska restrictions could not limit it. That, as I see it, was their burden. *See United States v. Skinna,* 931 F.2d at 533. If they were to invalidate the regulation, they would have to show that the regulation was improper under the existing facts, or at least improper as applied.

This need not be an insurmountable burden. Defendants could have attempted to show that the limiting of the sale of spawn on kelp was not at all necessary to protect the fishery. Nor would it be improper to attempt to show that herring spawn taken other ways can be sold, whereas herring spawn acquired under a subsistence permit cannot be. That may well violate the directions of both ANILCA and the Alaska statutes. Both of those direct that priority be given to subsistence uses. Those injunctions would not appear to have been followed if non-subsistence users could sell herring spawn while subsistence users could not. *See* 16 U.S.C. §§ 3112(2) and 3114; Alaska Stat. § 16.05.258(c). But

what is before us is not *what could have been* asserted and developed in the district court. We are faced with what *was* done there.

In short, the defense here was, at most, that the Haidas had engaged in extensive customary trade in the past, and that Alaska's limitation or prohibition of that trade made the regulation of defendants' activities illegal, ipso facto. That defense depended on the following syllogism: Alaska allows some subsistence uses; customary trade (including cash sales) is a subsistence use; therefore, Alaska must allow customary trade (including cash sales). That syllogism is false. Thus, I respectfully dissent.

---

**3.** *See also United States v. Skinna,* 931 F.2d 530    (9th Cir.1991).