UNITED STATES of America,

v.

Robert J. GEHL, George Jackson, Tempo-
tech Industries, Inc., and Gehl Pro-
ductions, Inc., Defendants.

No. 93–CR–300.

United States District Court,
N.D. New York.

May 13, 1994.

Gary L. Sharpe, U.S. Atty., Syracuse, NY, for the U.S.

Bond Schoeneck & King, George H. Lowe, Syracuse, NY, for defendant Jackson.

Honigman Miller Law Firm, Richard E. Zuckerman, Cindy Thomas, Detroit, MI, for defendants Robert Gehl, Tempotech & Gehl Productions.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

### FACTUAL BACKGROUND

"Once again, a little fish has caused a commotion." *Maine v. Taylor,* 477 U.S. 131, 132, 106 S.Ct. 2440, 2444, 91 L.Ed.2d 110 (1986) (and cases cited therein). Although those words were not written with this case in mind, they certainly could have been. This time though a great commotion has been caused by tiny salmon eggs.

The defendants Robert J. Gehl, Tempotech Industries, Inc., Gehl Productions, Inc.[1] and George Jackson,[2] are engaged in the business of, among other things, processing, distributing and selling fish eggs on an interstate and international basis. The Gehl defendants have processing plants in six states, including New York and Michigan. The indictment charges that all of the defendants were engaged in a scheme whereby they obtained salmon eggs near Tempotech's Pulaski, New York facility and processed those eggs into caviar. After that the caviar was transported to another of Tempotech's facilities in Hart, Michigan, so that the defendants allegedly could obscure the caviar's place of origin—New York State. The indictment further charges that the caviar was then returned to wholesale and retail facilities in Brooklyn, New York, and elsewhere, and eventually it was sold to "residents of New York State, among others." Indictment at ¶ 3. Under the government's version of events, defendants engaged in this plan because they knew that it was prohibited to sell for human consumption salmon eggs taken from certain New York State waters.

On September 1, 1993, the defendants were named in a 25 count indictment. That indictment can be easily divided into two parts. The first six counts charge the defendants with violating the Lacey Act Amendments of 1981 ("the Lacey Act" or "the Act"), 16 U.S.C. § 3371 et seq.[3] Counts seven through twenty-five charge only the Gehl defendants with violating certain laws pertaining to the filing of Cash Transaction Reports. Today the court is only concerned with the first six counts of the indictment— the Lacey Act counts.

Relatively speaking, Lacey Act prosecutions are not common-place. A glance at the Act's legislative history, particularly with respect to the 1981 Amendments, provides some insightful background. Passed in 1900, the Lacey Act was one of this country's first federal wildlife laws. S.Rep. No. 97–123, 97th Cong., 1st Sess., at 2 (1981) *reprinted in,* U.S.Code Cong. & Admin.News vol. 3 at 1749 (1981). "It was viewed then, and should be viewed now, not as increasing the Federal role in managing wildlife, but as a Federal tool to aid the States in enforcing their own laws concerning wildlife." *Id.* When Congress amended the Lacey Act in 1981 it did so "to provide comprehensive enforcement of wildlife laws and regulations established by state and local entities." *United States v. Big Eagle,* 881 F.2d 539, 540–541 (8th Cir. 1989), *cert. denied,* 493 U.S 1084, 110 S.Ct. 1145, 107 L.Ed.2d 1049 (1990). This Congressional intent is manifested in Senate Report No. 97–123, which states, in part:

> Enforcement of these laws is important both to ensure that endangered species are not further threatened with extinction, and to afford management of healthy wildlife populations for hunting and other recreational purposes * * * S. 736 would not constitute a broadening of federal authority under the Act, but merely would allow the federal government to provide more adequate support for the full range of state, foreign, and federal laws that protect wildlife.

*Id.* at 540 (quoting S.Rep. No. 97–123, 97th Cong., 1st Sess., at 2–4 (1981) (accompanying 95 Stat. 1073), *reprinted in,* U.S.Code Cong. & Admin.News vol. 3 at 1748, 1749–1751 (1981)).[4] Perhaps of more significance to the present case is that in amending the Lacey Act, Congress also intended "to deal with 'massive illegal trade in fish and wildlife and their parts and products.'" *United States v. Carpenter,* 933 F.2d 748, 751 (9th Cir.1991) (quoting S.Rep. No. 123, 97th Cong., 1st Sess. 4, *reprinted in* 1981 U.S.Code Cong. & Admin.News 1748, 1751).

To further these legislative ends, the Lacey Act makes it a federal crime to "to

---

1. For brevity, these defendants will be referred to collectively throughout as the Gehl defendants.

2. Robert Gehl is the President of both defendant corporations. George Jackson is the General Manager of defendant Tempotech's Hart, Michigan facility.

3. The first count of the indictment is actually a conspiracy to violate the Lacey Act, whereas counts two through five charge the defendants with specific Lacey Act violations.

4. *See also United States v. Cameron,* 888 F.2d 1279, 1284 (9th Cir.1989) ("The Lacey Act was designed to strengthen and support existing wildlife laws.").

import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce ... any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State[.]" *See* 16 U.S.C. § 3372(a)(2)(A) (West 1985). The defendants are charged with violating, among other things, this provision of the Act. The indictment also charges defendants with violating section 3373(d)(1)(B) of the Act.[5] The court admits to being somewhat perplexed by this alleged violation because at least on its face section 3373(d)(1)(B) just sets forth the criminal penalties for violations of certain Lacey Act provisions, such as section 3372(a)(2)(A). It does not independently proscribe any certain conduct under the Act.

In any event, this case has spawned a host of motions and on March 15, 1994, the court heard oral argument with respect thereto. Two of those motions are the subject of the court's decisions today[6]—the defendants' motion to dismiss counts one through six of the indictment, the Lacey Act counts, and the government's motion to disqualify all defense counsel.[7]

## DISCUSSION

In the present action, the Lacey Act counts are predicated upon a New York

State statute, N.Y.Envtl.Conserv.Law § 11–0107(2) (McKinney 1984),[8] and a New York State regulation, 6 N.Y.C.R.R. § 37.1 ("section 37.1"). This motion to dismiss focuses only upon whether the Lacey Act counts are sustainable based upon section 37.1. The defendants offer three separate reasons as to why, in their view, the court has no choice but to dismiss the Lacey Act counts:[9] (1) section 37.1 is unconstitutional; (2) the DEC exceeded the scope of its authority in promulgating that regulation; and (3) section 37.1 was improperly promulgated. The court will first address the constitutional argument.

## I. Commerce Clause

The Commerce Clause of the United States Constitution grants Congress the power "[t]o regulate Commerce ... among the several States." Art. I, § 8, cl. 3. Just recently, the Supreme Court explained, as it has on prior occasions, "[t]hough phrased as a grant of regulatory power to Congress, the [Commerce] Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Systems, Inc. v. Department of Environmental*

5. Section 3373(d)(1)(B) states as follows
 Any person who— ...
 violates any provision of this chapter (other than subsections (b) and (d) of section 3372 of this title) by knowingly engaging in conduct that involves the sale or purchase of, the offer of sale or purchase of, or the intent to sell or purchase, fish or wildlife or plants with a market value in excess of $350, knowing that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, any underlying law, treaty or regulation, shall be fined not more than $20,000, or imprisoned for not more than five years, or both.
 16 U.S.C. § 3373(d)(1)(B) (West Supp.1994).

6. With one exception (the defendants' motion for a bill of particulars), the other motions which were argued on March 15, 1994 have been resolved either by court order and/or agreement of counsel.

7. The motion to disqualify is the subject of a separate memorandum-decision and order filed concurrently herewith.

8. That statute prohibits the following:

No person shall, at any time of the year, buy, sell, offer or expose for sale, transport, or have in his possession any fish protected by law, game, protected wildlife, shellfish, harbor seals, crustacea protected by law, or part thereof, or protected insect, whether taken within the state or coming from without the state, except as permitted by the Fish and Wildlife Law.
17½ N.Y.Envtl.Conserv.Law § 11–0107(2) (McKinney 1984).

9. While the resolution of this motion is obviously important to all of the defendants, it is more so for defendant Jackson because he is named only in the first six counts of the indictment. Granting this motion to dismiss would therefore result in dismissal of the indictment as against him. Rather than filing a separate motion to dismiss, however, defendant Jackson simply adopts the position taken by the Gehl defendants in this regard. Affidavit of George H. Lowe (Nov. 14, 1993), at ¶2. Thus, for purposes of the court's analysis herein, there is no need to distinguish between defendant Jackson and the Gehl defendants.

*Quality,* —— U.S. ——, ——, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994) (citations omitted). "The Framers granted Congress plenary authority over interstate commerce in 'the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'" *Id.* at ——, 114 S.Ct. at 1349 (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 325–326, 99 S.Ct. 1727, 1730–31, 60 L.Ed.2d 250 (1979) and citing The Federalist No. 42 (J. Madison)). "'This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, ... has as its corollary that the states are not separable economic units.'" *Id.* (quoting *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 537–53, 69 S.Ct. 657, 664–68, 675–79, 93 L.Ed. 865 (1949)).[10] It is against this historical backdrop that the court must view the parties' respective Commerce Clause arguments.

Section 37.1 states in relevant part:

**Regulation prohibiting the sale of certain fishes taken from Lake Ontario, its tributaries and the St. Lawrence River.** (a) [N]o person shall sell, offer for sale or expose for sale the listed species of fish or parts thereof, except for eggs of chinook and coho salmon which may be sold only by sport fishermen for use as bait, taken from Lake Ontario and its tributaries upstream to the first barrier impassable by fish and the St. Lawrence River, ....

Defendants' exh. A (copy of 6 N.Y.C.R.R. § 37.1) (emphasis in original). The defendants strenuously contend that section 37.1 violates the Commerce Clause because it "has the effect of directly regulating activity occurring wholly outside the State of New York[.]" Memorandum of Law in Support of Gehl Defendants' Motion to Dismiss ("Gehl Defendants Memorandum") at 4. They further contend that section 37.1 violates the Commerce Clause because it "burdens interstate commerce when less restrictive means

are available to accomplish the purported governmental interest." *Id.* Implicit in these contentions is the assumption that in ascertaining whether section 37.1 passes constitutional muster, the court should apply a heightened or stricter level of scrutiny.

The government responds that section 37.1 does not discriminate against interstate commerce, and if so it does so only incidentally. The government goes so far as to claim that not only is section 37.1 not discriminatory, but it has just the opposite effect, reasoning: "By enacting regulations to protect the health and welfare of its citizens, New York State forgoes financial opportunities which other states with lesser contamination problems enjoy." United States' Response to Motion to Dismiss ("United States' Response") at 17. Thus, the government strongly urges application of what is sometimes referred to as the *Pike* balancing test, after the Supreme Court case of the same name. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Under that approach, when a given regulation or statute effects interstate commerce only incidentally, it "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142, 90 S.Ct. at 847.

■ Given these divergent views, the court's first task on this motion is to decide which level of scrutiny should be utilized in considering whether section 37.1 violates the Commerce Clause. As the foregoing demonstrates, to do that the court must first determine in what way, if at all, the challenged regulation burdens interstate commerce. *See Oregon Waste Systems, supra,* —— U.S. at ——, 114 S.Ct. at 1350 (quoting *Hughes, supra,* 441 U.S. at 336, 99 S.Ct. at 1736) (other citation omitted) ( [w]e have held that the first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it "regulates evenhandedly with only 'incidental effect on interstate commerce, or discrimi-

---

**10.** *See also Alliance for Clean Coal v. Craig,* 840 F.Supp. 554, 558 (N.D.Ill.1993) (quoting *Baldwin v. G.A.F. Seelig,* 294 U.S. 511, 523, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935)). ("The commerce clause is based on the theory that the United States is one indivisible economic unit. It represents the framers' vision that 'the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union not division.'").

nates against interstate commerce.' "). Once that issue is resolved, the applicable test will become apparent.

Because of its factual similarities to the present case, and because of the relative paucity of case law involving Commerce Clause challenges to Lacey Act prosecutions, the court is compelled to discuss in some detail a seminal Supreme Court Lacey Act case, *Maine v. Taylor, supra.* The Supreme Court in *Taylor* engaged in a Commerce Clause analysis of the Lacey Act Amendments of 1981—the federal statute which forms the basis for the first six counts of the indictment herein. The controversy in *Taylor* centered on whether Maine's statutory ban on the importation of live baitfish unconstitutionally burdened interstate commerce, such that it should not be permitted to form the basis for a Lacey Act prosecution. Explaining that two different tests have emerged to determine whether a state statute or regulation is constitutional under the Commerce Clause, the Court distinguished between statutes that burden interstate commerce only incidentally and those that affirmatively discriminate against interstate commerce:

> [w]hile statutes in the first group violate the Commerce Clause only if the burdens they impose on interstate trade are "clearly excessive in relation to the putative local benefits," *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 [90 S.Ct. 844, 847, 25 L.Ed.2d 174] (1970), statutes in the second group are subject to more demanding scrutiny. The Court explained in *Hughes v. Oklahoma,* 441 U.S. [322], at 336, [99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979),] that once a state law is shown to discriminate against interstate commerce 'either on its face or in practical effect,' the burden falls on the State to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means.....

477 U.S. at 138, 106 S.Ct. at 2447 (other citations omitted); *see also Chemical Waste Management, Inc. v. Hunt,* —— U.S. ——, ——, 112 S.Ct. 2009, 2014, 119 L.Ed.2d 121 (1992); *Fort Gratiot Sanitary Landfill, Inc.,*

*v. Michigan Department of Natural Resources,* —— U.S. ——, ——, 112 S.Ct. 2019, 2027, 119 L.Ed.2d 139 (1992).

In *Taylor* the statute under attack "restrict[ed] interstate trade in the most direct manner possible, blocking all inward shipments of live baitfish at the State's border." *Id.* at 137, 106 S.Ct. at 2447. Thus, the Supreme Court upheld application of "[t]he strict requirements of *Hughes v. Oklahoma,* notwithstanding Maine's argument that those requirements were waived by the Lacey Act Amendments of 1981." *Id.* at 138, 106 S.Ct. at 2447. Citing several factors, including the prevalence of three types of parasites in out-of-state baitfish which were not common to Maine baitfish, and the fact that non-native species which accidently commingle with shipments of baitfish "could disturb Maine's aquatic ecology to an unpredictable extent[,]" the Court found that Maine had a legitimate reason, apart from origin, to discriminate against out-of-state baitfish. *Id.* at 141, 106 S.Ct. at 2448. The Court further found that Maine established that there were not alternative means available to protect its baitfish supply, because it was nearly impossible to inspect baitfish shipments for parasites and commingled species. *Id.* at 146–147, 106 S.Ct. at 2451–252. In reaching that conclusion, the Court reasoned:

> More importantly, we agree with the District Court that the 'abstract possibility,' ..., of developing acceptable testing procedures, particularly when there is no assurance as to their effectiveness, does not make those procedures an '[a]vailabl[e] ... nondiscriminatory alternativ[e].' ..., for purposes of the Commerce Clause.

*Id.* at 147, 106 S.Ct. at 2452 (citation omitted). The Court also noted its agreement "with the District Court that Maine has a legitimate interest in guarding against imperfectly understood environmental risks despite the possibility that they may ultimately prove to be negligible." *Id.* at 148, 106 S.Ct. at 2452. Thus, in *Taylor* even though the environmental argument fell far short of being ironclad, nonetheless, the Supreme Court was willing to uphold a blatantly discriminatory state statute.

■ Initially the burden is on the party making a Commerce Clause challenge, here the defendants, to show that the legislation discriminates against interstate commerce on its face or in its purpose and effect. *Hughes v. Oklahoma,* 441 U.S. at 336, 99 S.Ct. at 1736. As the Supreme Court has observed, however, "there is no 'clear line' separating close cases on which [level] of scrutiny should apply[.]" *Wyoming v. Oklahoma,* —— U.S. ——, —— n. 12, 112 S.Ct. 789, 800 n. 12, 117 L.Ed.2d 1 (quoting *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986)). As will be seen, the present case is close in terms of deciding to which level of scrutiny section 37.1 should be subjected for purposes of analysis under the Commerce Clause.

■ Plainly, section 37.1 does not discriminate against out of state concerns on its face. The defendants seemed to concede this much when, at oral argument, they described this regulation as being "sterile." The court agrees with this characterization. Section 37.1 draws no distinction between New York residents and non-New York residents; it is a flat out prohibition against the sale by anyone (residents and non-residents alike) of salmon eggs from certain New York State waters, for use other than as bait. Section 37.1 does no more than ban the sale of such eggs, for use other than as bait, irrespective of the residency of the person attempting to sell the same. Nor does the challenged regulation specify a different application depending upon the residency of the "sport fishermen." Thus, this regulation is not protectionist in the most direct sense. Hence, because this regulation does not on its face "affirmatively discriminate" against interstate commerce, it does not automatically trigger a heightened level of judicial scrutiny. *Maine v. Taylor,* 477 U.S. at 38, 106 S.Ct. at 2447; *see Hertz Corp. v. City of New York,* 1 F.3d 121, 131 (2d Cir.1993). The court's inquiry cannot end at this point however. Absence of facial discrimination does not necessarily save section 37.1 from being held to a stricter level of scrutiny under the Commerce Clause.

As the Supreme Court recognized in *Taylor,* a "more demanding scrutiny" is also mandated where the regulation is "shown to discriminate ... in practical effect[.]" *Id.* Therefore, the court must next focus on whether section 37.1 has the "practical effect" of discriminating against interstate commerce because, as the defendants vigorously contend, it "directly regulat[es] commercial conduct occurring beyond the boundaries of the regulating state [New York][.]" Gehl Defendants' Memorandum at 5. The government responds that the regulation does not have the "practical effect" of discriminating against interstate commerce because the regulation "contains no discrimination or benefit in favor of New York State or its residents." United States' Response at 17. Indeed, at oral argument the government again stressed that any economic benefit which could possibly be derived from section 37.1 inures to the benefit of other states. That is so reasons the government because in the absence of contaminants such as those which purportedly motivated the enactment of section 37.1 other states are free to exploit their salmon resources in any way they see fit; and thus are able to enjoy the concomitant financial rewards which are unavailable to New York residents.

The Supreme Court's decision in *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), soundly dispels that notion, however. In *Bacchus,* the Supreme Court found a statute exempting certainly locally-produced alcoholic beverages from a 20 percent excise tax on wholesale liquor sales to be "clearly discriminatory," *id.* at 271, 104 S.Ct. at 3055, "despite the fact that the out-of state plaintiffs were 'free to take advantage of the benefit of the exemption by selling the exempted products themselves.'" *Id.* at 278, 104 S.Ct. at 3058 (Stevens, J., dissenting). Thus, after *Bacchus,* in the court's view the government places too much emphasis on the fact that section 37.1 supposedly operates to benefit out-of-state residents and not to discriminate against them.

What is more, the government seemingly did not look beyond the face of section 37.1; because when that is done it can be seen that

this regulation has the "practical effect" of discriminating against interstate commerce, but not precisely for the reason urged by the defendants. The defendants assert that section 37.1 has the "practical effect" of discriminating against interstate commerce because it regulates conduct occurring wholly outside New York State. That regulation does not purport to regulate conduct occurring wholly outside New York State though, especially when the unique facts of this case are considered. The indictment describes the alleged scheme as involving significant activities within New York State, such as the processing of New York salmon eggs, and their distribution for resale within this State. Thus, section 37.1, particularly as it applies to this case, cannot be read as regulating conduct occurring wholly outside New York State. Furthermore, the Lacey Act counts in the present case are not based upon defendants' residency, or their sale of eggs outside New York State,[11] they are based on the fact that section 37.1 bans the sale of salmon eggs from certain New York State waters, for human consumption, by anyone. *Cf. United States v. Borden,* 10 F.3d 1058, 1063 (4th Cir.1993) (rejected Commerce Clause attack on Lacey Act convictions where defendants were convicted pursuant to state regulations prohibiting musseling in the Ohio River by anyone).

Section 37.1 has the practical effect of discriminating against interstate commerce because it enhances the sphere of commerce relating to "sport fishermen" selling the salmon eggs for bait, to the exclusion of others, such as these out-of-state defendants, who want to sell the eggs commercially for other purposes. Practically then, these defendants are discriminated against in their ability to conduct their business (processing, distribution and sale of salmon eggs) through interstate commerce. They are not free under section 37.1 to take salmon eggs from certain New York State waters and then sell them in another state. Put slightly differently, section 37.1 discriminates because it elevates the interests of "sport fishermen" selling eggs for bait over the interests of those, such as these out-of-state defendants, who want to sell the eggs commercially for use other than as bait. Consequently, although the regulation may not have been motivated by economic protectionism, arguably it has that effect.[12] In that regard, it is significant to note that the Supreme Court has recognized that a state's purpose in establishing a given statute or regulation is irrelevant to the Commerce Clause issue as "the evil of protectionism can reside in legislative means as well as legislative ends." *Philadelphia v. New Jersey,* 437 U.S. 617, 626, 98 S.Ct. 2531, 2536–37, 57 L.Ed.2d 475 (1978). Thus, at the end of the day, the court is forced to con-

---

11. As the court mentioned at oral argument, there is a discrepancy between the indictment and the government's motion in this regard. The indictment, which includes an allegation that the caviar was sold to "residents of New York State, among others[,]" is broader than what the government is now claiming in response to defendants' motion to dismiss. Indictment at ¶ 3. Both in its opposition papers and at oral argument the government emphasized that despite what the indictment charges, the salmon eggs were all obtained from within New York State and were all sold within this State. *See* United States' Response at 15. The government cannot have it both ways. Based upon these recent representations by the government, the court will read the indictment as alleging that the salmon eggs originated within New York State and were sold within this State as well. The government's proof at trial will thus be limited accordingly. Limiting the proof in this way effectively renders moot the defendants' argument that this indictment is aimed at prosecuting defendants solely for the out-of-state sale of New York salmon eggs.

12. It is interesting to note, although not critical to the court's analysis at this juncture, that the DEC's authority to manage and regulate a Pacific Salmon stocking program, with the goal of establishing a multi-million dollar sport fishery in upstate New York, was extended through December, 1978. *See* Government's exhs. 1 and 2. And, in conjunction with the first extension in 1972, the DEC, in setting forth arguments in support of such an extension, stated that with this stocking program, "it may be possible to produce spectacular fishing comparable to that enjoyed in Lake Michigan in recent years with attendant recreational and **economic benefits.**" Government's exh. 2 (emphasis added). Thus, while economic protectionism *per se* might not have been underlying this legislation, which, as will be discussed, the Government contends was the enabling statute for the promulgation of section 37.1, there certainly was an economic component.

clude that section 37.1 has the "practical effect" of discriminating against interstate commerce.[13]

■ Because the court has determined that section 37.1 has the "practical effect" of discriminating against interstate commerce, the burden shifts to the government "to demonstrate **both** that the statute 'serves a legitimate local purpose,' **and** that this purpose could not be served as well by available nondiscriminatory means...." *Maine v. Taylor*, 477 U.S. at 138, 106 S.Ct. at 2447 (quoting *Hughes v. Oklahoma*, 441 U.S. at 336, 99 S.Ct. at 1736) (emphasis added); *see also Chemical Waste*, —— U.S. at ——, 112 S.Ct. at 2014 (state must justify challenged legislation "both in terms of the local benefits flowing from [it] and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake[,]" otherwise legislation is invalid under the Commerce Clause) (quoting *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977)).

A review of Supreme Court Commerce Clause jurisprudence discloses that several widespread legal principles have emerged with respect to regulations purporting to govern health and safety concerns, such as regulation section 37.1. For Commerce Clause purposes, the Supreme Court has "long recognized a difference between economic protectionism, on the one hand, and health and safety regulation, on the other." *Fort Gratiot Sanitary Landfill, Inc.*, —— U.S. at —— n. 6, 112 S.Ct. at 2026 n. 6 (citing *H.P. Hood & Sons v. DuMond*, 336 U.S. 525, 533, 69 S.Ct. 657, 662–63, 93 L.Ed. 865 (1949)); *see also, Sporhase v. Nebraska*, 458 U.S. 941, 956, 102 S.Ct. 3456, 3464, 73 L.Ed.2d 1254 (1982). For the most part, the Supreme Court has been reluctant to invalidate local health or safety regulations as violative of the Commerce Clause. *See, e.g., Maine v. Taylor*, 477 U.S. at 149, 106 S.Ct. at 2453, *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 670, 101 S.Ct. 1309, 1316,

67 L.Ed.2d 580 (1981); *Raymond v. Motor Transp., Inc.*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978); and *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 109, 69 S.Ct. 463, 465, 93 L.Ed. 533 (1949). Consequently, the Supreme Court has stated that "if safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce." *Kassel*, 450 U.S. at 670, 101 S.Ct. at 1316 (quoting *Raymond*, 434 U.S. at 449, 98 S.Ct. at 798).

### 1. "Legitimate Local Purpose"

Despite defendants' protestations to the contrary, in light of the foregoing, there is little doubt that a legitimate local purpose underlies section 37.1. The government offers not one, but two, asserted "legitimate local purposes" for the promulgation of section 37.1. According to the government, "the overriding purpose" of this regulation is to "minimize health risks from human consumption of the eggs[.]" United States' Response at 18 and 19. Second, the regulation was promulgated to "ensure salmon population reserves." *Id.* at 19. After *Taylor*, wherein the Supreme Court recognized that Maine had a "legitimate interest in guarding against imperfectly understood environmental risks **despite the possibility that they may ultimately prove to be negligible**[,]" the State's concern with protecting the public from consuming chemically contaminated fish eggs, is certainly a matter of legitimate local purpose. *See Taylor*, 477 U.S. at 148, 106 S.Ct. at 2452 (emphasis added). *Taylor* also supports the government's assertion that the preservation of salmon reserves is a matter of legitimate local concern. *See New York State Trawlers Ass'n v. Jorling*, 16 F.3d 1303, 1308 (2d Cir.1994) (quoting *Maine v. Taylor*, 477 U.S. at 140, 106 S.Ct. at 2448) (other citation omitted) ("The protection of the environment and conservation of natural resources—including marine resources are areas of 'legitimate local concern.' ").

---

13. The court readily admits that it is erring on the side of caution in so holding; but if section 37.1 can withstand defendants' Commerce Clause attack under a heightened level of scruti-

ny, then, *a fortiori*, as later noted, that regulation could also withstand scrutiny under a lesser standard of review.

Moreover, "[a]s long as a State does not needlessly obstruct interstate trade or attempt to 'place itself in a position of economic isolation,' it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources." *Maine v. Taylor,* 477 U.S. at 151, 106 S.Ct. at 2454 (quoting *Baldwin v. G.A.F., supra,* 294 U.S. at 527, 55 S.Ct. at 502). There is nothing in the present record to suggest that the State of New York was attempting to place itself in a position of economic isolation when it promulgated section 37.1. By the same token, there is ample proof in the record that the State of New York had a legitimate reason, apart from economic motivation, to prohibit the sale of salmon eggs from certain New York State waters for human consumption; and that is the fact that those eggs had been found to contain elevated levels of chemical contaminants which are detrimental to the public health and welfare. *See generally* Affidavit of Nancy H. Kim, Ph.D. (Jan. 13, 1994), and exhibits thereto; *see also* Affidavit of Lawrence C. Skinner (Jan. 11, 1994), and exhibits thereto. In addition, as in *Maine v. Taylor,* "there is little reason in this case to believe that the legitimate justifications the State has put forward for its [regulation] are merely a sham or a *'post hoc* rationalization.'" *Maine,* 477 U.S. at 149, 106 S.Ct. at 2453 (quoting *Hughes,* 441 U.S. at 338 n. 20, 99 S.Ct. at 1737 n. 20).

Conceding that the health of New York citizens is "undeniably a legitimate subject of local regulation," the defendants nevertheless go on to assert that "[t]here can be no legitimate *local* health purpose served by regulating sale transactions outside the State." Gehl Defendants' Memorandum at 10 (emphasis in original). While that may be true, the defendants are overlooking the fact that based upon the allegations in the indictment, there is a very real public health concern at stake in that salmon eggs regulated by section 37.1 were allegedly processed and ultimately distributed for human consumption within New York State. The court therefore finds that the government has satisfied its burden of articulating a legitimate local pur-

pose justifying section 37.1. That is especially so considering that the interests articulated by the government—health, safety, and environmental—have "traditionally" been considered "legitimate local benefits." *Mid-Atlantic Building Systems Council v. Frankel,* 17 F.3d 50, 52 (2d Cir.1994) (citing *City of Philadelphia,* 437 U.S. at 624, 98 S.Ct. at 2535). Furthermore, the government's asserted justifications for the promulgation of section 37.1 certainly are not illusory, and thus the court " 'may not sit as a superlegislature to judge the wisdom of the legislative policy determinations.' " *New York State Trawlers Ass'n, supra,* 16 F.3d at 1308 (quoting *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976)). The court will thus move on to address whether "this purpose could not be served as well by available nondiscriminatory means." *See Maine v. Taylor,* 477 U.S. at 138, 106 S.Ct. at 2447 (citations omitted).

### 2. *"Available Nondiscriminatory Means"*

Although the court agrees with the government that section 37.1 is supported by a legitimate local purpose arising primarily out of a public health concern, that does not necessarily mean that this regulation is constitutionally sound. Under *Maine v. Taylor,* as mentioned earlier, the government must also show that these purposes "could not be served as well by available nondiscriminatory means." *Id.* The defendants believe that the government cannot make such a showing because less restrictive alternatives are available; namely health advisories, such as those made available to recreational "fishermen", could also be provided to consumers purchasing New York salmon eggs.[14] Another less restrictive alternative suggested by the defendants is that New York salmon eggs could be tested prior to sale, with the additional requirement that contaminated eggs not be sold. In that way, the defendants assert, consumers would be provided even more protection than they are under the current regulation.

14. Currently the New York Department of Health ("DOH") issues health advisories "to warn peo-

ple who may consume contaminated fish caught recreationally." Kim Affidavit at ¶ 8.

The government has two responses. First, it asserts that the State "has engaged in far less than the total restriction on use of [its] salmon eggs[,]" in that the regulation impacts only upon commercially sold eggs for human consumption. United States' Response at 19. Next, the government asserts that the current regulation is "significantly less broad than the total ban initially placed in effect in the 1970s." *Id.* Although not entirely responsive to the defendants' arguments, nonetheless the court sides with the government and finds that the purposes (health, safety and environmental) which this regulation was designed to address "could not be served as well by available nondiscriminatory means." *See Maine v. Taylor,* 477 U.S. at 138, 106 S.Ct. at 2447.

In the present case, just as in *Maine v. Taylor,* the government has shown, through the affidavit of Lawrence Skinner, the Department of Environmental Conservation's ("DEC") Section Head for the Environmental Monitoring Section of the Division of Fish and Wildlife, that "[s]ince fish length can not be used to predict chemical concentrations in eggs, the only methods to prevent introduction of chemically adulterated fish eggs into food markets is either to chemically test eggs from each individual fish, or to prevent all sales of salmon eggs for human consumption." Skinner Affidavit at ¶ 7. Skinner further opines that "[t]he cost of chemical analysis would be prohibitive." *Id.* at ¶ 8. He then goes on to detail in his affidavit why that is so. *See id.* at ¶¶ 8–9. Based upon the foregoing, there does not appear to the court to be an alternative means available to insure that the public is protected from consuming contaminated salmon eggs.

The defendants suggest, however, that something short of a complete ban on the commercial sale of New York salmon eggs is available because the cost of such testing would be borne by commercial ventures, as opposed to the State. While it may be feasible for commercial enterprises, such as de-

fendants, to bear the cost of testing for chemical contaminants,[15] in suggesting that alternative, the defendants are ignoring the government's second and perhaps more convincing point which is that the "imposition of a testing requirement would be practically unenforceable by the State[,]" especially "where the products would be in interstate commerce." *Id.* at ¶ 10. Consequently, the court concludes that the government has met its burden here, even under a heightened level of scrutiny, and finds that section 37.1 does not violate the Commerce Clause in that it does not amount to an invalid restraint on interstate commerce.

Before leaving the Commerce Clause, the court points out that even if it agreed with the government that section 37.1 only incidentally effects interstate commerce, and as a result applied the *Pike* test,[16] in all likelihood it still would uphold this regulation because the current record does not support a finding that "the burdens [section 37.1] imposes on interstate trade are 'clearly excessive in relation to the putative local benefits.'" *See Maine v. Taylor,* 477 U.S. at 138, 106 S.Ct. at 2447 (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. at 847). Thus, when all is said and done it strikes the court that defendants' argument is nothing more than a fairly transparent attempt to circumvent *Maine v. Taylor,* which the court cannot endorse. Regardless of how section 37.1 is analyzed, it does not violate the Commerce Clause; and consequently the defendants' motion to dismiss counts one through six of the indictment on that basis is denied.

## II. Validity of Section 37.1

Even if the court finds, as it has, that section 37.1 does not violate the Commerce Clause, the defendants argue, alternatively, that the Lacey Act counts still must be dismissed because section 37.1, which is encompassed in those counts, was not properly promulgated. The defendants offer three

---

**15.** The court is hesitant to accept this notion given the lack of support for it in the record. Moreover, this hesitancy is compounded by Mr. Skinner's averment that, "Based on recent analyses, at least 80 percent of all eggs processed would be unacceptable for sale. It is believed

that this type of handling would effectively eliminate the economic advantage of processing large quantities of salmon eggs without regard to adulterants." Skinner Affidavit at ¶ 9.

**16.** *See* p. 1154, *supra.*

separate reasons as to why the court should invalidate that regulation, and, in turn, dismiss counts one through six of the indictment: (1) in promulgating section 37.1, the DEC exceeded the permissible scope of its regulatory authority; (2) section 37.1 was promulgated in violation of required statutory procedures; (3) the DEC acted in an arbitrary and capricious manner when it promulgated section 37.1. The court will separately address each of these arguments in turn.

■ Before doing so, though, the court must consider an argument belatedly raised by the government. For the first time, at oral argument the government asserted that in this federal prosecution the defendants may not collaterally attack the predicate state regulation—section 37.[17] Instead, the proper recourse for these defendants, according to the government, would have been for them to have challenged section 37.1 in some other independent, pre-indictment proceeding. Then, asserts the government, only with a favorable judgment in hand would the defendants now be in a position to attack section 37.1. Because it was not discussed at all in the parties' briefs, the court is somewhat reluctant to delve too far into this issue. On the other hand, the court cannot ignore this point entirely because if it were to accept the government's argument, then the defendants' challenge to the validity of section 37.1 would fall by the wayside.

Case law on the issue of whether it is permissible to collaterally attack a state regulation in a federal Lacey Act prosecution is not plentiful. A fairly recent Ninth Circuit case, *United States v. Alexander*, 938 F.2d 942 (9th Cir.1991), provides some guidance however. The defendants in *Alexander* were convicted for trafficking in herring roe under the Lacey Act. On appeal they argued, among other things, that the underlying state regulations were in conflict with federal

law, and thus could not sustain the Lacey Act convictions. The government responded that the defendants could not rely on that asserted conflict to overturn the Lacey Act convictions "because they failed to petition the Board of Fisheries to change its regulations before they went fishing." *Id.* at 947. In quite picturesque language, the Ninth Circuit flatly rejected this suggestion by the government:

> The image of these two defendants driving their beat-up Dodge station wagon to the Board of Fisheries to argue that a small section of the regulations is inconsistent with an obscure phrase in a massive federal statute is a bit incongruous; they are fishermen, not legal scholars. **Their only meaningful opportunity to challenge the regulations was at their trial.** We will not find their challenge precluded 'unless there is persuasive reason to believe that such was the purpose of Congress.'

*Id.* (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)) (footnote omitted) (emphasis added). The *Alexander* Court was not so persuaded. Thus, for that reason, among others, the Ninth Circuit sanctioned the consideration of the validity of the underlying state regulations in the course of adjudicating the Lacey Act criminal case. *Id.* at 947–48.

While the defendants in the present case do appear more sophisticated than those in *Alexander*, they are still not legal scholars. They should not be precluded from challenging the validity of section 37.1 during the course of this prosecution simply because they were, in all likelihood, unaware of what appears to be a little known and evidently seldom invoked regulation buried deep in the New York Code of Rules and Regulations.[18] Furthermore, as the *Alexander* Court pointed out in a slightly different context, assuming the availability of another forum for chal-

---

17. At oral argument the government supplied the court with a copy of its brief in the case of *United States v. Gutherie*, No. 93–6508 (S.D.Ala.), which is currently on appeal to the Eleventh Circuit. The court has not considered that brief in connection with this motion.

18. By this statement the court is not condoning ignorance of the law. Rather the court is only trying to illustrate, from a practical standpoint, how unlikely it would be that before being indicted, or subject to some other enforcement proceeding under this regulation, a lay person would have any reason to be aware of section 37.1.

lenging this regulation, the defendants would then be put to the additional expense and delay of another legal proceeding.[19] If the defendants were successful, and if in the meantime they were convicted of the Lacey Act counts, then they would have to collaterally attack the convictions because the underlying state regulation was declared invalid. As the *Alexander* Court astutely observed, "[t]he net result would be the same but the delay and number of proceedings would triple." *Id.* at 948 n. 10.

In addition to the resultant inefficiency from adopting the government's suggested approach, the defendants' challenge to section 37.1 should not be precluded because, as in *Alexander*, there is no "persuasive reason to believe that such was the purpose of Congress." *See id.* at 947. A quick perusal of the Lacey Act's legislative history, and the 1981 amendments in particular, does not disclose any clear intent on the part of Congress to preclude a Lacey Act defendant from challenging the validity of the underlying state law or regulation. *See generally* S.Rep. No. 97–123, 97th Cong., 1st Sess. (1981), *reprinted in,* U.S.Code Cong. & Admin.News vol. 3 at 1748 *et seq.* (1981). Moreover, implicit in that history is the assumption that the underlying state, foreign or federal law is enforceable. *See id.* at 1751 ("In order to prosecute a case under … the current Lacey … Act and this revision, it is necessary to first prove that there has been a State, foreign, or another Federal violation."). Thus, it appears to the court that the legisla-

tive history to the Act's 1981 amendments does not evince a Congressional intent to bar collateral attacks of underlying state regulations in a Lacey Act prosecution.[20]

Furthermore, there is one practical concern which the court has with respect to the issue of a collateral attack on section 37.1 in this prosecution. If the defendants had not challenged section 37.1 now, and they were later convicted on the Lacey Act counts, they might well appeal on the basis that section 37.1 is invalid. Under those circumstances, the government undoubtedly would argue that the defendants waived their right to raise that issue. In fact, in *United States v. Skinna,* 931 F.2d 530 (9th Cir.1991), another Lacey Act prosecution, the Ninth Circuit acknowledged that potential waiver impediment. In attempting to overturn his Lacey Act conviction, defendant Skinna argued on appeal that the underlying state laws, which formed the basis for that conviction, were invalid because they conflicted with federal laws. The Court observed, however, that "[t]he degree to which we can entertain [defendant's] argument is greatly circumscribed by the fact that he never directly presented it to the district court." *Id.* at 531; *see also United States v. Wagner,* 989 F.2d 69, 76 (2d Cir.1993) (citation omitted) (generally "a reviewing court will not consider claims not presented before the district court[ ]"). Admittedly, the court is speculating in introducing this scenario, but it simply wants to apprise the parties, and the government in particular, of this concern. The government

---

**19.** The government did not specify what would be an appropriate forum or procedural mechanism (e.g., an article 78 proceeding) for challenging section 37.1, apart from the present criminal action. Depending upon a variety of factors, such as the forum, a number of potential barriers come readily to mind which could possibly bar such an ancillary proceeding by these defendants. For example, if the defendants commenced a pre-indictment proceeding, would they even have standing to challenge this regulation? In a similar vein, would a controversy exist at that point; and if so, would it be ripe for adjudication? Likewise, would defendants be time barred from raising issues such as whether the DEC complied with statutory rulemaking procedures? *See* 56A N.Y.S. A.P.A.Law § 202(8) (McKinney Supp.1994) (proceeding to challenge rule on grounds of noncompliance with certain procedural requirements thereunder must be

commenced "within four days from the effective date of such rule"). *But see United States v. Borden, supra,* 10 F.3d at 1062 (emphasis in original) (quoting *United States v. Thomas,* 887 F.2d 1341, 1349 (9th Cir.1989) (other citation omitted) (refusing to overturn Lacey Act conviction where state statute of limitations had run on predicate state offenses because section 3372(a)(2)(A) " 'is not designed to incorporate state *procedural* law[ ]' ").

**20.** Perhaps such an intent on the part of Congress is absent because, as the *Alexander* Court recognized: "Although the Supreme Court has held that Congress may prohibit such challenges during time of war, …, there is some doubt whether Congress may constitutionally do so during peacetime." 938 F.2d at 947 n. 8 (citations omitted).

cannot argue that the defendants are precluded from collaterally attacking section 37.1 in this case, and then, on appeal, argue that the defendants waived their right to challenge the validity of that regulation. For all of these reasons, the court rejects the notion that the defendants are not entitled to challenge the validity of section 37.1 in this Lacey Act prosecution.[21]

### A. Scope of DEC's Statutory Authority

Having resolved that subsidiary issue, the court is now free to turn to the substantive issues raised by defendants' attack on the validity of section 37.1.[22] The defendants believe that section 37.1 exceeds the permissible scope of the DEC's regulatory authority because it purports to regulate the sale of "processed" salmon eggs, and under the ECL the DEC is only authorized to regulate the sale of "raw or unprocessed Pacific salmon eggs"[23] and "viable eggs of any species of the [salmon] family." See N.Y.Envtl.Conserv.Law §§ 11–0305(14) and 11–1709. Section § 11–0305(14) **currently** reads as follows:

> In addition to the powers and duties provided in other sections of the Fish and Wildlife Law, the department [DEC] shall have the following powers and duties: ...

> (14) Notwithstanding any other provision of law, **to regulate** the possession, transportation, **sale**, barter and purchase of **Pacific salmon and parts thereof;** and to require permits or **otherwise regulate the sale,** barter and purchase of **raw or unprocessed Pacific salmon eggs.**

17½ N.Y.Envtl.Conserv.Law § 11–0305(14) (McKinney Supp.1994) (emphasis added). Section 11–1709 states:

> Notwithstanding any other provision of the Fish and Wildlife Law the department [DEC] may establish by order regulations governing the importation from without the state or transportation within the state of any **live fish or viable eggs** of any species of the family Salmonidae (trout, salmon, whitefish and grayling).

17½ N.Y.Envtl.Conserv.Law § 11–1709 (McKinney 1984) (emphasis added). Thus, argue the defendants, because these provisions of the ECL are silent as to the DEC's authority to regulate the sale of processed salmon eggs, such as those which are the subject of the indictment, the DEC exceeded

---

**21.** There is one final aspect of this collateral attack issue upon which the court is constrained to comment. In response to the government's assertion that they could not collaterally attack the validity of section 37.1, relying upon *United States v. Sohappy*, 770 F.2d 816 (9th Cir.1985), *cert. denied*, 477 U.S. 906, 106 S.Ct. 3278, 91 L.Ed.2d 568 (1986), the defendants also contend that it is the government which bears the burden of proof with respect to the validity of the underlying state regulations, and not the defendants. The Ninth Circuit in *Sohappy* unequivocally held that the burden is on the federal government to establish the validity of state regulations encompassed in a Lacey Act prosecution, as opposed to the burden being placed on the defendants to prove the invalidity of those regulations. *Id.* at 823. The Court gave the following rationale for its holding:

> Given that states must bear the burden in state prosecutions, we do not believe that Congress intended to relieve the federal government, in a Lacey Act prosecution incorporating a state law violation, of the burden of establishing the state law's validity. To shift the burden to the defendant Indians would make it more difficult for the Indians to protect themselves against improper state encroachments on their treaty rights, an outcome that, in light of Congress'

explicit disclaimer, could not have been intended.

*Id.* at 823–24. Arguably, *Sohappy* is distinguishable from the present case however due to the concern over encroachment on Indians' treaty rights, which is obviously absent here. Irrespective, because, as will be seen, the government has demonstrated the validity of the predicate state regulation, the court need not decide whether *Sohappy* dictates that the burden is always on the government, in a case such as this, to prove the validity of the underlying state law or regulation.

**22.** At the defendants' request, as allowed by Fed. R.Evid. 201, the court has taken judicial notice of the New York State Administrative Procedure Act ("SAPA"), the New York Executive Law, as well as the New York Agriculture and Markets Act and the New York Environmental Conservation Law ("ECL").

**23.** As an aside, the defendants note that under the ECL a "Pacific salmon" includes Coho and Chinook salmon to which the regulation clearly applies. *See* N.Y.Envtl.Conserv.Law § 11–0103(1)(e) (McKinney Supp.1994). That definition was not added, however, until 1990—well after the passage of section 37.1. *Id.*, History and Statutory Notes, 1990 Amendments.

the scope of its regulatory authority when it promulgated section 37.1.

The government correctly responds that ECL § 11–0305(14) was not added until 1988, and thus could not have been the authority for the promulgation of section 37.1, which was adopted nearly a full ten years earlier on August 17, 1978. *See* 17½ N.Y.Envtl.Conserv.Law § 11–0305(14), Historical and Statutory Notes, 1990 Amendments (McKinney Supp.1994). Further responds the government, the DEC did not rely on ECL § 11–1709 as statutory authority for promulgating section 37.1. Indeed, on the face of it ECL § 11–1709 does not authorize the DEC to regulate the **sale** of processed salmon eggs because, as just recited, that statute pertains directly to the DEC's authority to regulate the "**importation** from without the state or **transportation** within the state of **any live fish or viable eggs** of any species of the family Salmonidae...." 17½ N.Y.Envtl.Conserv.Law § 11–1709 (McKinney 1984) (emphasis added). The government opines that rather than looking to either of those two provisions of the ECL, as the defendants do, the authority to regulate the sale of processed salmon eggs, and hence promulgate section 37.1. is found in former ECL § 11–0305(13). That statute granted the DEC the following authority:

> Notwithstanding any other provision of law, **to regulate** until December thirty-first, nineteen hundred seventy-two the seasons, size and catch limits, **manner of taking, possession, transportation and sale of coho, chinook** and sockeye (koka-nee) **salmon,** and to regulate fishing in waters where upstream migration of said species may occur.

N.Y.Envlt.Conserv.Law § 11–0305(13) (emphasis added). Subsequently, this authority was twice extended, with the final extension through December 31, 1978. *Id.* Historical Note (McKinney 1984); *see also* Government's exh. 2.

In rejoinder, the defendants assert, rather cavalierly, that "[t]he Government has missed the boat: the DEC has no choice but to rely on the ECL which is its enabling statute, and its failure to do so will void a conflicting regulation." [24] Reply Memorandum in Support of the Gehl Defendants' Motion to Dismiss ("Reply Memorandum") at 4 (citation omitted). The defendants make one last point with respect to the DEC's regulatory authority, or lack thereof, and that is that the Department of Agriculture and Markets ("DAM") has the authority to regulate processed foods such as salmon eggs, and not the DEC. So, in the defendants' view, in promulgating section 37.1, which purports to regulate processed salmon eggs, the DEC invaded the exclusive province of the DAM.

■ A careful reading of section 37.1, as well as the statutory authority for promulgating the same, reveals that both parties have "missed the boat." As statutory authority for the promulgation of section 37.1, the regulation itself identifies only ECL §§ 11–0317 and 11–0325 [25]—a fact which the parties overlook by focusing instead on other provisions of the ECL as previously mentioned.[26]

---

**24.** This statement strikes the court as non-responsive. The government is not suggesting that the statutory authority for promulgating section 37.1 lies outside the ECL; the government is simply relying upon ECL provisions different than those relied upon by the defendants.

**25.** *See* Government's exh. 9 (copy of order promulgating section 37.1 provided to the governor on August 17, 1978); *see also* Defendants' exh. A (copy of 6 N.Y.C.R.R. § 37.1).

**26.** Both the government and the defendants discuss ECL §§ 11–0317 and 11–0325, except they do so in connection with the issue of whether the DEC followed the necessary procedures in promulgating section 37.1. As will be discussed, while §§ 11–0317 and 11–0325 are relevant to those procedural issues, the latter at least is also relevant to the DEC's authority to promulgate section 37.1 in the first place. The parties' failure to recognize this is particularly surprising given the fact, as just mentioned, that the order promulgating section 37.1 expressly states that it is being adopted "[p]ursuant to the provisions of Sections 11–0317 and 11–0325 of the Environmental Conservation Law...." *See* Government's exh. 9. Likewise, the regulation as it currently appears in Title 6 of the New York Code of Rules and Regulations unequivocally states, "Statutory authority: Environmental Conservation Law, §§ 11–0317 and 11–0325." Defendants' exh. A. The defendants' failure to acknowledge this in discussing the DEC's statutory authority to promulgate section 37.1 is all the more puzzling given their concession that, apart from section 11–0317, section 11–0325 is "the only other statutory authority for the Regulation." Gehl Defendants' Memorandum at 18.

In fact, as recently as September 22, 1993, in response to defendants' Freedom of Information Law request,[27] the DEC supplied "[a] copy of 6NYCRR Part 37 ... **along with copies of statutory authorities upon which it is based (Environmental Conservation Law sections 11–0317 and 11–0325).**" Defendants' exh. M at 1 (emphasis added). Thus, even the promulgating agency itself, the DEC, acknowledges that the statutory authority for section 37.1 derives from ECL §§ 11–0317 and 11–0325. Consequently, the court will limit its inquiry to whether in 1978 those two provisions of the ECL provided the DEC with the requisite authority to promulgate section 37.1. This limitation is also due to the fact that, as just discussed, with one exception (ECL § 11–0305(13)), the other provisions of the ECL mentioned by the parties as possible statutory bases for section 37.1 are inapposite.

The issue of whether the first ECL provision listed as statutory authority for section 37.1, ECL § 11–0317, authorized the DEC to promulgate that regulation can be quickly resolved. In essence, ECL § 11–0317 authorizes the DEC, after consulting with the appropriate agencies of neighboring states and the Province of Ontario, to adopt regulations pertaining to open seasons, minimum size limits, and manner of taking with respect to fish in the waters, of among other places, Lake Ontario.[28] As the government accurately points out, in a slightly different context though, "[o]n its face, ECL § 11–0317

does not govern regulations respecting the **sale** of fish or fish eggs." United States' Response at 5 (emphasis in original). Thus, despite the fact that ECL § 11–0317 is referenced on the face of section 37.1, the court is not convinced that that statute granted the DEC the necessary authority to promulgate that particular regulation.

■ By contrast, ECL § 11–0325 did grant the DEC the authority necessary to promulgate section 37.1. That statute provides in relevant part:

Whenever it is jointly determined by the Department of Environmental Conservation and the Department of Health or the Department of Agriculture and Markets, and certification is made to the Commissioner of Environmental Conservation by the Commissioner of Health or the Commissioner of Agriculture and Markets, that a disease, which endangers the health and welfare of fish or wildlife populations, or of domestic livestock or of the human population, exists in any area of the state, or is in imminent danger of being introduced into the state, the department [DEC] **shall adopt any** measures or **regulations with respect to the** taking, transportation, **sale, offering for sale or possession** of native fish or feral animals it may deem necessary in the public interest to prevent the introduction or spread of such disease.

17½ N.Y.Envtl.Conserv.Law § 11–0325(1) (McKinney 1984) (emphasis added).[29] The

---

**27.** On September 2, 1993, pursuant to the New York Freedom of Information Law, N.Y.Pub.Off. §§ 84 *et seq.*, the Gehl defendants sought certain information relating to the promulgation of section 37.1 Defendants' exh. L.

**28.** Section 11–0317(3), in its entirety, reads as follows:

After consultation with the appropriate agencies of the neighboring states and the Province of Ontario, the department shall have power to fix by order open seasons, minimum size limits, manner of taking, and creel and seasonal limits for the taking fish in the waters of Lake Erie, Lake Ontario, the Niagara river and the St. Lawrence river. Such open seasons, manner of taking and limits shall, whenever possible, be made uniform with those fixed by the neighboring states and the Province of Ontario, as the case may be, for the waters in question with respect to all species upon which agree-

ment can be reached with the appropriate agency of that jurisdiction.
17½ N.Y.Envtl.Conserv.Law § 11–0317(3) (McKinney 1984). This statute was amended in 1990, but its essence has remained the same. *Compare id. with* 17½ N.Y.Envtl.Conserv.Law § 11–0317(3) (McKinney Supp.1994).

**29.** As will be discussed later, section 37.1 does not specify upon which particular subdivision of this statute the DEC relied when it promulgated that regulation. Nor is the subdivision specified on any of the other documentation provided to the court in connection with the adoption of this regulation, including the order adopting the same. *See* Government's exh. 9. At this juncture, however, because ECL § 11–0325(2) obviously is not relevant to the enactment of section 37.1, pertaining as it does to the spread of "epizootic disease," the court will only be concerned with subdivision one of ECL § 11–0325.

defendants' primary objection to ECL § 11–0325(1) as the enabling statute for section 37.1 is the fact that on its face that statute pertains only to fish and not to fish eggs. The defendants strongly argue that fish and fish eggs are not synonymous terms under the ECL. In support of this contention, defendants refer to several other provisions of the ECL where terms such as "eggs" and "parts thereof" are employed. Thus, according to the defendants, this evinces an intent on the part of the legislature to distinguish between fish, fish eggs, and parts of fish, as those terms are used in the ECL. Therefore, the issue becomes whether the word "fish" contained in section 11–0325(1) also includes fish eggs and, more particularly, processed salmon eggs.

True, ECL § 11–0325(1) does not explicitly refer to processed salmon eggs, or, for that matter, even to fish eggs generally. It does not necessarily follow from that, however, that the DEC did not have the authority thereunder to promulgate section 37.1. Given the complete lack of reported case law on the extraordinarily narrow issue of whether the DEC's authority to regulate the sale of fish under ECL § 11–0325(1) also encompasses the authority to regulate the sale of fish eggs, the court will turn to the ECL itself for guidance.

In 1978 when section 37.1 was promulgated, the only distinction found in the ECL pertaining explicitly to fish was in section 11–1709, which referred to "live fish or viable eggs." *See* 17½ N.Y.Envtl.Conserv.Law § 11–1709 (McKinney 1984).[30] In the court's opinion, that distinction actually augurs in favor of a finding that "fish," as that word is used in ECL § 11–0325(1), includes non-viable fish eggs, such as the processed salmon eggs which are the subject of this indictment. If under ECL § 11–0325(1), fish did not include non-viable fish eggs, then in 1978 there would have been a gap in the DEC's regulatory authority; it would have had the authority to regulate viable fish eggs, but it would not have had the authority to regulate non-viable fish eggs. Surely given the legislature's concern at the time with, *inter alia,* proper management of the salmon fishery resource, *see* Government's exh. 2, it did not intend to leave such a gap in the DEC's regulatory authority. *Cf. Rainbow Beach Ass'n v. Dep't of Health,* 187 A.D.2d 891, 892, 590 N.Y.S.2d 561, 562 (3rd Dep't 1992) (citations omitted) ("[a] cornerstone of administrative law is that the Legislature may fix a primary standard and then endow agencies with the power 'to fill in the interstices in the legislative product by prescribing rules and regulations consistent with the enabling legislation'...."). In the absence of any statutory authority to the contrary,[31] the court will fill that gap by inferring that the DEC's general authority to regulate the sale of fish as provided in section 11–0325(1) extended to the regulation of the sale of fish eggs, including processed fish eggs. As opposed to the defendants' overly restrictive view of the

---

**30.** Admittedly the court did not scrutinize the entire ECL as it read in August, 1978. The court did however review each of those provisions of the ECL recited by counsel at oral argument in support of defendants' position that the terms fish and fish eggs as used in the ECL are not interchangeable. As discussed herein, for a variety of reasons, the court is not convinced that the language of any of these statutes proposed by the defendants requires a finding that in 1978 "fish" in ECL § 11–0325(1) was not also meant to include fish eggs.

The court cannot disregard the fact that its own research did reveal though that in 1978 the ECL did contain one reference to "part thereof" and that is found in ECL § 11–0107(2). That statute reads as follows:

No person shall, at any time of the year, buy, sell, offer or expose for sale, transport, or have in his possession any fish protected by law, game, protected wildlife, shellfish, harbor seals, crustacea protected by law, or part thereof, or protected insect, whether taken within the state or coming from without the state, except as permitted by the Fish and Wildlife Law.

17½ N.Y.Envtl.Conserv.Law § 11–0107(2) (McKinney 1984). For the reasons set forth above, however, that lone reference to "part thereof" does not convince this court that "fish," as that word is used in ECL § 11–0325(1) was not also intended to include fish eggs. In addition, as long as the court is engaging in this semantical analysis of the ECL, it observes that arguably the term "part thereof" would not include a fish egg, because a fish egg could be viewed as an entity separate and distinct from the fish, as opposed, for example, to a fish eye (a popular delicacy at the moment in Japan).

**31.** The court was unable to find any, and the parties offered none.

meaning of "fish" as that word is employed in ECL § 11–0325(1), the approach taken by the court here will produce a result in harmony with legislative intent.

Of equal if not more import is the fact that the distinction which the defendants are now trying to draw between unprocessed and processed fish eggs did not arise until the enactment of § 11–0305(15), effective April 1, 1989—well after the enactment of section 37.1. *See* Government's exh. 6. Consequently, the court is not convinced that when the legislature used the word "fish" in ECL § 11–0325(1), it intended to exclude from the definition of that word fish eggs. Moreover, a finding that the DEC's grant of authority in ECL § 11–0325(1) to regulate the sale of fish also encompasses the authority to regulate the sale of fish eggs is consistent with the general principle that "[i]f the power exercised by the agency constitutes a "legitimate reasonable and direct adjunct to the Commission's explicit statutory power", ..., then an express grant of authority is not necessary to sustain the validity of the challenged rule or regulation." *Touche Ross & Co. v. SEC,* 609 F.2d 570, 579–80 (2d Cir. 1979) (footnote omitted) (quoting *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 655, 98 S.Ct. 2053, 2067, 56 L.Ed.2d 591 (1978) (quoting in turn *United States v. Chesapeake & Ohio Railway Co.,* 426 U.S. 500, 512, 96 S.Ct. 2318, 2324, 49 L.Ed.2d 14 (1976)).

The defendants assert that by granting the DEC the authority to regulate "raw or unprocessed" salmon eggs, such as currently exists under § 11–0305(14),[32] as well as the authority to regulate "viable" salmon eggs under ECL § 11–1709,[33] the DEC's authority to regulate processed salmon eggs was withdrawn. The court disagrees. First, assuming *arguendo* that the DEC's authority to regulate processed salmon eggs was somehow circumscribed by the enactment of ECL § 11–0305(14), because that statute did not become effective until well after 1978, the fact that long after section 37.1 was promulgated the DEC had the express authority to

regulate "raw or unprocessed" salmon eggs has no bearing on whether the DEC had the authority to regulate processed eggs in 1978. Second, for the reasons just discussed, the court also does not subscribe to the view that the DEC's authority to regulate "viable eggs," as found in ECL § 11–1709, means that the DEC did not also have the authority to regulate non-viable fish eggs in 1978.

Finally, the court is also not swayed by the defendants' assertion that it is within the exclusive province of the DAM, and not the DEC, to regulate processed fish eggs. As repeatedly stated, prior to 1989, the ECL did not distinguish between unprocessed and processed fish eggs. Consequently, even if after 1989 the DAM and the DEC now have separate spheres of regulatory power with respect to processed and unprocessed fish eggs, that most surely was not the case in 1978 when section 37.1 was promulgated. Further, the court has additional observations as to the regulatory authority of the DAM versus that of the DEC in this case. The first observation is that given the undeveloped state of the record, the court cannot say with certainty that defendants' facilities would necessarily fall within the purview of the DAM's regulatory authority, as described in 2B N.Y.Agric. & Mkts.Law § 251–z–1 *et seq.*[34] In addition, that particular Act governs, as its name indicates, the "licensing of food processing establishments." *See id.* It does not purport to govern sale transactions, independent of processing, of the kind alleged in the indictment. What is more, given the broad grant of authority contained in ECL § 11–0325(1), this argument does not alter the court's view that in 1978 the DEC had the authority to regulate the sale of fish eggs.

In sum, based upon the foregoing, the court holds that in 1978 when section 37.1 was promulgated, the DEC had the requisite

---

**32.** *See* p. 1163, *supra.*

**33.** *See id.*

**34.** The defendants refer to §§ "251–2–(4)," "251–2–1" and "251–2–9," but that is a typo-

graphical error. Following the number 251 in each of those statutes is the letter "z" and not the number "2".

statutory authority to do so under ECL § 11–0325(1).[35]

### B. Compliance with Statutory Rule-making Procedures

 Next the defendants argue that even if the DEC had the authority to promulgate section 37.1, that regulation still cannot form the basis for the Lacey Act counts because the DEC failed to follow ECL §§ 11–0317 and 11–0325 when promulgating it. In particular, as to section 11–0317, the defendants contend that the DEC failed to comply with that statute on two grounds. First, the DEC allegedly did not consult with "appropriate agencies of the neighboring states and the Province of Ontario." See 17½ N.Y.Envtl.Conserv.Law § 11–0317(3) (McKinney 1984). Second, the defendants contend that, inconsistent with ECL § 11–0317(3), the DEC imposed a ban on the sale

of New York salmon eggs, rather than simply regulating the "manner of taking" as this statute allows. Insofar as ECL § 11–0325 is concerned, the defendants again protest that the DEC did not comply with that statute in two ways. Supposedly the DEC did not obtain the "certification" required thereunder.[36] In addition, the defendants believe that no finding of a "disease" was ever made to support section 37.1, as ECL § 11–0325(1) requires.[37]

The government's response is two-fold. As explained earlier, because ECL § 11–0317 does not seem to provide the authority for promulgating section 37.1, despite the fact that the regulation itself lists that statute as one basis of its "statutory authority," the government contends that it was under no obligation to consult with other agencies as

35. Arguably, as the Government points out, the DEC had the authority pursuant to ECL § 11–0305(13), as it read in August, 1978, to promulgate section 37.1. Because that particular statute is not mentioned on the regulation itself as authority for promulgating the same, and because ECL § 11–0325, one of the ECL provisions recited on section 37.1 as statutory authority for its enactment does authorize such regulation, it is not critical that the court decide whether ECL § 11–0305(13) provides an alternative basis for the promulgation of section 37.1. The court observes, however, that if ECL § 11–0325 did not invest the DEC with the authority to promulgate section 37.1, that regulation would not necessarily be invalidated. Under those circumstances, the court would be inclined to look to other statutory authority, such as ECL § 11–0305(3), as a basis for upholding the validity of the challenged regulation.

36. See p. 1165, supra.

37. At oral argument the defendants raised two other claimed procedural deficiencies. The first is that DEC's general counsel at the time, Philip Gitlen, was not a delegated official and thus was not in a position to submit section 37.1 to the Secretary of State, as required under SAPA § 202(3). The second claimed deficiency is the DEC's failure to specify the particular subdivision of the enabling statute which granted it the authority to promulgate.section 37.1 in the first place. Given the manner in which these arguments were raised (i.e. mentioned for the first time at oral argument and thus not briefed at all), they appear to be nothing more than an afterthought, and not worthy of indepth legal analysis. For the sake of completeness, the court is compelled to at least touch upon these arguments however.

The short answer to both of these comparatively minor procedural points is that it simply does not matter whether the DEC followed the SAPA rulemaking procedures to the letter. All that the SAPA requires is "substantial compliance" therewith. 1976 N.Y.Laws ch. 935, § 4; see also Industrial Liaison Committee v. Williams, 131 A.D.2d 205, 210, 521 N.Y.S.2d 321, 325 (3rd Dep't 1987), aff'd on other grounds, 72 N.Y.2d 137, 531 N.Y.S.2d 791, 527 N.E.2d 274 (1988). The rational for such a standard is as follows: "Since the purpose of the [SAPA] is to establish fairness and uniformity in agency rule making, it has been held that so long as an agency acts in substantial compliance with the procedural provisions of SAPA, Article 2, its actions will not be overturned." The Desmond–Americana v. Jorling, 143 Misc.2d 711, 713–14, 541 N.Y.S.2d 930, 932 (Sup.Ct.Alb.Co.), modified on other grounds, 153 A.D.2d 4, 550 N.Y.S.2d 94 (3rd Dep't 1989) (and cases cited therein). Thus, assuming for the moment that Mr. Gitlen was not a delegated official and so could not submit section 37.1 to the Secretary of State, and also assuming that the DEC failed to specify the particular subdivision of the enabling statute which gave it the authority to promulgate that regulation, the court is not persuaded that these asserted omissions demonstrate that the DEC failed to substantially comply with statutory rulemaking procedures, in a manner which would justify invalidating section 37.1. (By the way, as long as the court is sidetracked in this procedural minutiae, it notes that in 1978, the New York Executive Law did not require that the certificate accompanying a newly adopted regulation contain the specific section or subdivision of the statutory authority. See 1976 N.Y.Laws ch. 935, § 12.)

ECL § 11–0317 dictates. As to ECL § 11–0325, the government retorts that the DEC **did** comply with the procedures set forth therein; and thus the defendants' argument is wholly without merit.

Insofar as compliance with ECL § 11–0317 is concerned, as already discussed, because the court is persuaded that ECL § 11–0317 did not give the DEC the authority to promulgate section 37.1, it is immaterial whether the DEC complied with ECL § 11–0317. Accordingly the defendants' attempt to invalidate section 37.1 on this ground is unavailing.

Whether the DEC complied with ECL § 11–0325(1) when it promulgated section 37.1 warrants more discussion, however. As previously set forth, ECL § 11–0325(1) contains an express requirement, among other things, that either the Commissioner of Health or the Commissioner of Agriculture and Markets certify "that a disease, which endangers the health and welfare of … the human population, exists in any area of the state, or is in imminent danger of being introduced into the state[.]" 17½ N.Y.Envtl.Conserv.Law § 11–0325(1) (McKinney 1984). Only then "shall" the DEC adopt "any measures or regulations" as described therein. *Id.* With respect to this requirement, the defendants first claim that no DOH certification was ever issued specifically pertaining to the promulgation of section 37.1. In that regard, the defendants point out that in the two years preceding the promulgation of section 37.1, the DOH did issue certifications, but they concerned only consumption of fish from Lake Ontario, and did not expressly mention the sale of fish eggs. The defendants further note that the alleged failure to issue the proper certification in connection with section 37.1 was especially egregious because the certification issued in 1977, which the government claims, among others, supports section 37.1, specifically permitted the "ingestion of Coho salmon under twenty-one inches … once per week[,]" and also, that certification did not specifically reference fish eggs. Defendants' exh. D at 1, ¶ 3.

The government's response requires a close look at the history of section 37.1. Pri-

or to its enactment in 1978, pursuant to ECL § 11–0325, on September 14, 1976, the then Commissioner of Health certified to the then Commissioner of the DEC "that the health and welfare of the human population may be endangered by the consumption of fish taken from Lake Ontario by reason of a concentration of certain specified pesticides, Mirex and Kapone." Defendants' exh. B. The Health Commissioner therefore recommended that certain kinds of salmon, among other fish, should not be consumed. *Id.* Based upon that certification, that same day, the DEC Commissioner adopted a regulation, as "an emergency measure," prohibiting the possession of, among other types of fish, coho and chinook salmon caught in the Lake Ontario area, as more fully described therein. *See* Government's exh. 8. The government explains that this emergency regulation "did not prohibit the sale of fish eggs since it was unlawful to even possess them." United States' Response at 7. Therefore, the government believes that a sale prohibition would have been "redundant." *Id.*

In March, 18, 1977, the Health Commissioner issued another certification to the DEC Commissioner; this certification too was made pursuant to ECL § 11–0325. *See* Defendants' exh. D. As did the prior certification, this one stated that "[t]he health and welfare of the human population may be endangered by the consumption of fish taken from Lake Ontario by reason of a concentration of chemical toxins including the pesticides, Mirex and Kepone." *Id.* Included in that certification were several recommendations regarding the consumption of fish, such as that noted by the defendants regarding the "ingestion of Coho salmon under twenty-one inches … once per week." *Id.*

After that, on August 17, 1978, the DEC repealed the emergency regulation and promulgated section 37.1. Therefore, in essence, the government contends that the State of New York did fully comply with ECL § 11–0325(1) because the 1976 certification satisfied that statute in that "[t]he specific prohibition on sale of eggs contained in the 1978 rulemaking was not a new prohibition…." United States' Response at 8. As further support for the view that the 1976

certification is sufficient to support section 37.1, promulgated in August, 1978, the government points to a press release from the Health Commissioner dated approximately four and a half months prior to the promulgation of that regulation, wherein he recognized the potential hazards associated with the consumption of certain fish from Lake Ontario due to levels of Mirex, PCBs and other toxic chemicals found in the flesh of those fish. *See* Government's exh. 10.

Unfortunately for the defendants, they are reading the certification component of ECL § 11–0325(1) far too narrowly. They insist that to support section 37.1 a certification was necessary explicitly pertaining to the sale of salmon eggs, rather than, as was the case, a certification dealing only with the consumption of fish. Section 11–0325(1) does not, however, define the nature of the certification required thereunder. Nor is such certification defined in any other part of the ECL.[38] All ECL § 11–0325(1) dictates is that certification be "made," and there is no question that that was done here. Thus, while it would have been advisable and indeed preferable for those responsible for the certification process to have acted with more clarity in connection therewith, the fact remains that the State did all that was required of it under ECL § 11–0325(1) as to certification. Therefore, the court finds that the State did comply with the certification provision of ECL § 11–0325(1); and thus the court will not invalidate section 37.1 on that basis, as defendants urge.

■■■ Even if the proper certification was made pursuant to ECL § 11–0325(1), the defendants nonetheless contend that the State did not fully comply with all of the procedures required thereunder because no finding was made that a "disease ... exists" or "is in imminent danger of being introduced into the state[,]" as that statute also directs.[39] The defendants reason that because the certifications mention only chemical contamination and do not make specific

mention of either of the foregoing, the court should find section 37.1 invalid and unenforceable. Put more bluntly, the defendants contend that the DEC took improper liberties, in contravention of the enabling statute, ECL § 11–0325, with the way in which it defined disease in that the DEC equated contamination with disease.

Relying in part upon the affidavit of Nancy K. Kim, Ph.D, current Director of the DOH's Division of Environmental Health Assessment, the government stridently counters that "[t]o suggest that ingestion of fish eggs and the potential arising therefrom for cancer and other pathogenic conditions is not a 'disease' contemplated by the Legislature in enacting ECL § 11–0325(1) is ludicrous." United States' Response at 9. The government then goes on to enumerate various disease risks associated with the ingestion of fish containing chemical contaminants. *Id.* at 10–12.

As with the meaning of fish in ECL § 11–0325(1), case law addressing the issue of what constitutes a disease under this same statute is nonexistent. Thus, in interpreting ECL § 11–0325(1), once again the court is forced to turn to the ECL itself and the underlying goals of that legislation. Before doing so, however, the court pauses first to consider *NYS Superfund Coalition, Inc. v. DEC,* 75 N.Y.2d 88, 550 N.Y.S.2d 879, 550 N.E.2d 155 (1989), a case heavily relied upon by the defendants. In *NYS Superfund,* the DEC believed that its authority to regulate hazardous waste when there is a "significant threat of harm" was coextensive with a finding that hazardous waste actually existed. The DEC's rationale was that because the ECL defines "hazardous waste" as "a substantial present or potential hazard to human health," a hazardous waste finding established the requisite "significant threat." Disagreeing, the Court of Appeals explained:

> The statute defines hazardous waste as that which may '[p]ose a substantial present or potential hazard to human health or

---

**38.** Certification is not defined in the definition portion of the statute, ECL § 11–0103, a logical starting point for ascertaining the meaning of a term used in the ECL. Furthermore, the court's research failed to unearth any reported case law

construing the certification requirement of ECL § 11–0325(1); nor did the parties provide the court with any such case law.

**39.** *See* p. 1165, *supra.*

the environment'.... Its own qualifying specificity requires a showing that the presence of hazardous wastes constitutes a 'significant *threat*' before the DEC can order remedial action.... By its plain language, therefore, and to avoid an otherwise tautological standard, more than the mere presence of hazardous waste-which is always potentially hazardous-must be proven before a 'significant threat' declaration under this regulatory scheme can be justified.

*Id.* at 93, 550 N.Y.S.2d at 880–81, 550 N.E.2d at 156–57 (citation omitted) (emphasis in original). Furthermore, the Court found the distinction between "hazardous wastes" and "significant threat" to be "crucial" because "the Legislature required that the 'significant threat' finding be traced into a factual record...." *Id.* at 93, 550 N.Y.S.2d at 881, 550 N.E.2d at 157 (citation omitted). The Court also found the regulation defective because it allowed the DEC "Commissioner to make a 'significant threat' decision on factual findings indicating that wastes at a site 'either actually *or potentially*' causes the environmental harms listed in [the regulation]." *Id.* (emphasis added). Last, the Court was concerned that this would automatically result in a finding of "significant threat" in direct contravention of the enabling statute's qualification.

In the court's opinion, however, *NYS Superfund* does not present a situation sufficiently analogous to this case such as would warrant overturning section 37.1. *NYS Superfund* is distinguishable on two primary bases. For one, the DEC's actions in that case greatly undermined, and in fact, obliterated the statute's required factfinding procedures. Additionally, in *NYS Superfund,* the DEC's interpretation, as implemented in the challenged regulation, allowed a finding of significant threat automatically to be made, in direct contravention of the statutory qualification. Here, a definition of disease which also includes contamination would not yield either of those results.

Moreover, accepting the defendants' excessively narrow definition of disease in the context of ECL § 11–0325 would have the undesirable effect of significantly eroding the State's ability to protect the public health and welfare, which clearly was the legislative purpose underlying this statute. As Dr. Kim convincingly explains:

[a]ll diseases are caused by agents and the measures authorized by ECL § 11–0325 are taken to prevent the introduction or spread of such agents.... For diseases caused by chemicals, however, the agent is the chemical itself. The chemicals which contaminated fish from Lake Ontario are know to cause disease. The introduction or spread of such diseases is controlled by limiting exposure to the chemicals. Here, the chemicals of concern, including but not limited to PCBs and mirex, posed a risk of disease to the human population sufficiently great that the Commissioner of Health determined that the statutory threshold of ECL § 11–0325 was satisfied. The Commissioner's phrase 'may be endangered' is, in the context of chemical contamination, the functional equivalent of a statement that a disease exists or is in imminent danger of being introduced.

Kim Affidavit at ¶ 22. Dr. Kim goes on to aver that, "If ECL § 11–0325 is not read to encompass this statement, no concentration of toxic chemicals, however dangerous, could ever form the basis for governmental action under this statute until illnesses or deaths resulted from exposure to those chemicals. Such a result would be inconsistent with the obligation of government to protect public health." *Id.* The court concurs with Dr. Kim's observations.

The defendants' attempt to distinguish contamination and disease, while perhaps superficially persuasive, cannot withstand close analysis when the legislative goals of this statute are also taken into account, as indeed they must. The purpose of ECL § 11–0325, as its name states, it to control dangerous diseases. *See* 17½ N.Y.Envtl.Conserv.Law § 11–0325 (McKinney 1984). If disease did not include chemical contamination under that statute, then, as Dr. Kim hypothesized, a situation would be created whereby risks associated with such contamination must be absolutely known, with the end result being that the State's ability to take the necessary action to protect the public health would be

seriously undermined—a result which would be incompatible with the goal of ECL § 11–0325.[40]

### C. Arbitrary and Capricious

In a final attempt to undermine the validity of section 37.1, the defendants maintain that it is arbitrary and capricious because at the time it was promulgated the DEC did not have before it sufficient evidence that New York State salmon eggs posed a health risk. The defendants surmise that the DEC did not begin to consider the health threat of salmon eggs until 1981—well after the promulgation of section 37.1. *See* Defendants' exh. I at 28. They also assert that by the time section 37.1 was promulgated in August, 1978, both the DEC and the DOH had implicitly repealed the factual underpinnings of the original September, 1976 order prohibiting the possession of certain types of eggs, and thus there was insufficient scientific evidence in August, 1978, to justify the enactment of section 37.1. At oral argument, the defendants repeatedly emphasized that it is the state of the scientific record in August, 1978 upon which the court must focus—not scientific evidence post-dating that time. Even using the standard advanced by the defendants, the court cannot find that the DEC acted in an arbitrary and capricious manner when it promulgated section 37.1.

Quite recently, the New York Court of Appeals restated the "settled standard" that in reviewing whether an agency determination is arbitrary and capricious, a court must "assess whether the action in question was taken 'without sound basis in reason and … without regard to the fact'[.]" *County of Monroe v. Kaladjian*, 83 N.Y.2d 185, 189, 608 N.Y.S.2d 942, 944, 630 N.E.2d 638, 640 (1994) (quoting *Matter of Pell v. Board of Educ.*, 34

N.Y.2d 222, 231, 356 N.Y.S.2d 833, 839, 313 N.E.2d 321, 325 (1974)). Under that standard, an agency's determination "need only be supported by a 'rational basis[.']" *Id.* (citations omitted).[41] Given this fairly deferential standard of review, after closely examining the entire record on this motion, the court simply cannot find that there was no "sound basis in reason" for the DEC's decision to promulgate section 37.1 Nor can the court find, as defendants so strenuously argue, that section 37.1 was promulgated without regard to fact. As fully detailed in the affidavit of Dr. Kim, and supplemented by the affidavit of Mr. Skinner, the DEC had before it sufficient facts from which it could determine, even as far back as August, 1978, that the consumption of fish eggs from certain New York waters posed a health risk. For example, "By December 20, 1977, DEC had information that PCB levels in several samples of Lake Ontario salmon eggs exceeded the FDA tolerance limit for PCBs in fish…. At that time, the tolerance limit for PCBs in fish was 5 ppm. Since PCBs and mirex are both persistent organochlorine chemicals which accumulate in fish tissues in a similar manner, it was reasonable for DOH and DEC to conclude that mirex levels in Lake Ontario salmon eggs were also elevated." Kim Affidavit at ¶ 21 (citing to exhibit Q thereto); *see also* Skinner Affidavit, exhs. 4 and 5 thereto (tables showing "chemical contaminants in eggs from salmon in Lake Ontario and its tributaries"). Consequently, although the court agrees with the defendants that the DEC cannot rely upon scientific data which post-dates the enactment of section 37.1 to support its enactment, the DEC did not do that here. The DEC's decision to promulgate section 37.1 was not made "without regard to fact." Accordingly, the court refuses to find that the DEC acted

---

**40.** The fact that the words "contaminants" and "contamination" are also used in the ECL, *see* 17½ N.Y.Envtl.Law §§ 1–0303(1) and (19); and 11–0515(4) (McKinney 1984 and Supp.1994), as the defendants remarked at oral argument, does not change the court's opinion that the relevant certifications comported with the "disease" component of ECL § 11–0325(1). For one thing, "contaminants" and "contamination" are used in an entirely different context.

**41.** *See also New York Dep't of Social Services v. Shalala*, 21 F.3d 485, 491–92 (2d Cir.1994) (internal citations omitted) ("In determining whether an agency has acted arbitrarily and capriciously in violation of 5 U.S.C. § 706(2)(A) [the federal Administrative Procedure Act], a court may not 'substitute its judgment for that of an agency,' …, but must determine whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment[.]" ' ").

arbitrarily and capriciously when it promulgated section 37.1

To summarize, the defendants' motion to dismiss counts one through six of the indictment is denied in all respects. Section 37.1 upon which those counts are premised does not violate the Commerce Clause. Nor is that regulation invalid for any reason; the DEC had the statutory authority to enact the same; it did so in compliance, or in substantial compliance, with statutorily prescribed procedures; and the regulation is not arbitrary or capricious.

IT IS SO ORDERED.